(No. 34066.—

ELIZABETH B. BOWMAN, Appellant, *vs.* ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.

*Opinion filed March 20, 1957—Rehearing denied May 20, 1957.*

SCHAEFER, HERSHEY, and DAVIS, JJ., dissenting:

JAMES A. DOOLEY, of Chicago, for appellant.

FLOYD E. THOMPSON, CHARLES J. O'LAUGHLIN, THOMAS P. SULLIVAN, JOSEPH H. WRIGHT, HERBERT J. DEANY, and ROBERT S. KIRBY, all of Chicago, for appellee.

HUGO M. FRIEND, GROVER C. NIEMEYER, and JOSEPH BURKE, *pro sese,* respondents.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This court has allowed plaintiff's petition for leave to appeal from a judgment of the Appellate Court reversing and remanding for a new trial a judgment entered by the circuit court of Cook County on a jury verdict awarding plaintiff damages under the Federal Employers' Liability Act in the amount of $200,000 for injuries sustained to plaintiff's ward, Charles D. Bowman, while in the course of his employment by defendant Illinois Central Railroad Company. The jury answered adversely to defendant this specific interrogatory: "Do you find by a preponderance of the evidence that at the time plaintiff's ward executed the release he was incapable of understanding what he was doing and unable to comprehend the terms and effect of the release?" The cause also presents plaintiff's motion for the issuance of this court's ancillary writ of *mandamus, certiorari,* or other writ to require the Appellate Court to strike the remanding portion of its order under section 75(2)(c) of the Civil Practice Act.

There are several distinct legal issues presented for our determination by this appeal: Whether under the terms of section 75(2)(c) of the Civil Practice Act (Ill. Rev. Stat. 1955, chap. 110, par. 75(2)(c),) the striking of a remanding order is mandatory upon the Appellate Court where the party whose judgment was reversed files the specified motion and affidavits, or whether the order may be stricken only where the judgment is reversed and remanded for insufficient evidence; whether the Appellate

Court can weigh the evidence in reviewing Federal Employers' Liability Act cases; whether the jury verdict is supported by the evidence; and whether the Appellate Court erred in its application of the law respecting the admission of certain evidence.

Before we can properly consider the questions of law relating to the merits of the cause, it is necessary to ascertain first whether the jurisdiction of this court can properly be invoked. Our appellate jurisdiction is prescribed by the Civil Practice Act, and section 75 authorizes petitions for leave to appeal from Appellate Court determinations. We will review such judgments, however, only where there has been a final appealable order. Defendant argues that since the Appellate Court has refused to strike the portion of its order remanding the cause for a new trial, no final appealable order is presented, and that this court is without power to order the Appellate Court to finalize its judgment.

Plaintiff maintains that under section 75(2)(c), when the party whose judgment was reversed and remanded for a new trial by the Appellate Court files the requisite motions and affidavits waiving a new trial and stating that he will be unable on a future trial to adduce other or additional evidence, it is mandatory for the Appellate Court to strike the remanding portion of its order; and that if the Appellate Court refuses to do so, the Supreme Court may, in aid of its appellate jurisdiction, issue the auxiliary writ of *mandamus* or *certiorari* to determine the questions of law presented in the cause.

This controverted section of the Civil Practice Act provides: "In any case heard and determined in the trial court upon actual trial in which the Appellate Court upon appeal from the final judgment or decree entered in the cause in the trial court reverses said judgment or decree and remands the cause for a new trial or hearing, and in which the party in whose favor the trial court's judgment

or decree was rendered shall present to and file with the Appellate Court an affidavit stating that he will be unable on a future trial or hearing to adduce other or additional evidence, facts or circumstances than were adduced in the trial court and expressly waiving the right to a new trial or hearing and consenting and requesting that the portion of the judgment of the Appellate Court remanding the cause for new trial or hearing be deleted and stricken from the judgment of the Appellate Court, then that court upon motion shall amend its judgment by striking out the portion thereof remanding the cause for new trial or hearing. Thereupon it shall be competent for the Supreme Court to grant leave to appeal from said final judgment of reversal for its review and determination with the same power and authority in the case, and with like effect, as in other cases in which leave to appeal from the final judgments of the Appellate Courts is authorized in this section."

In support of her contention, plaintiff cites the original historical note appearing in the annotated volume of the statutes (Smith-Hurd Ill. Anno. Stat., chap. 110, par. 75, p. 68,) wherein the provision is interpreted as imposing a mandatory requirement upon the Appellate Court to strike the remanding portion of its order where a party files a motion supported by proper affidavits. Plaintiff also cites similar interpretations by other authorities on the Civil Practice Act. 5 Nichols, Ill. Civil Practice, 643; 23 Chicago Bar Record 237, 251.

In an article on Illinois practice, prepared by one of the draftsmen of the act, Albert E. Jenner, Jr., shortly after enactment of section 75(2)(c), it is stated: "Under the practice obtaining prior to the enactment of subsection 75(2)(c) of the Civil Practice Act, a judgment of the Appellate Court reversing and remanding a case for a new trial could be made final for purposes of review by the Supreme Court on petition for leave to appeal if the Appellate Court, in its discretion, on motion and affidavit of the party in whose

favor judgment had been entered in the trial court, struck the remandment portion of its judgment. The applicant was required to state in the affidavit in support of his motion that he would be unable, on a further trial or hearing to adduce other additional evidence, facts or circumstances than were adduced on the trial resulting in the judgment reversed by the Appellate Court, expressly waiving his right to a new trial and consenting and requesting that the portion of the judgment of the Appellate Court remanding the cause for a new trial or hearing be deleted and stricken from the judgment of the Appellate Court. The amendment of the Appellate Court judgment by striking the remanding portion of the judgment was entirely discretionary with the Appellate Court. Section 75 of the Civil Practice Act was amended by adding a new subsection (2)(c), codifying the foregoing practice, *except that the striking of the remandment portion of the judgment of the Appellate Court is made mandatory."* (Ital. added.) 23 Chicago Bar Record 237, 251.

Defendant, however, in support of its contention that the striking of the remanding order is discretionary with the Appellate Court and should be exercised only where the cause is reversed on the ground of insufficient evidence, cites *Lees v. Chicago and North Western Railway Co.,* 409 Ill. 536. In the *Lees case* there were several charges of negligence, and the record did not disclose upon which ground plaintiff recovered in the trial court. On review, the Appellate Court held that a certain contract should have been admitted in evidence, and reversed and remanded the cause for a new trial. Upon plaintiff's motion, the remanding order was stricken. On appeal, the Supreme Court held that inasmuch as this contract, even if admitted in the record, was not a defense to all of the charges in the complaint, therefore it was not possible to enter a final judgment in favor of the defendant in the cause, and consequently the striking of the remanding order was not

proper. The court stated that the party seeking to strike the remanding order must present in his affidavit a question on which the Appellate Court can render a final judgment.

In the instant case, however, plaintiff has alleged a single basis for recovery, and defendant has interposed the defense of a release, which, if valid, would bar plaintiff's entire claim. The Appellate Court, as grounds for reversal, has found the evidence supporting the general and special verdicts, both favorable to the plaintiff, contrary to the manifest weight thereof, and that there were errors in the admission and rejection of evidence which tended to enhance the validity of the release; consequently, a final judgment for defendant could have been entered. Unlike the *Lees case* where the grounds for reversal by the Appellate Court involved a defense to only a part of plaintiff's claim, in the instant case the ground for reversal by the Appellate Court related to a defense which barred plaintiff's entire claim. Therefore, since a final order for defendant could be entered in the instant case, we cannot sustain defendant's contention that the *ratio decidendi* of the *Lees case* precludes the striking of the remanding order herein.

We are cognizant, however, of the further *dictum* by that court, relied upon by defendant, which would limit the application of section 75(2)(c) to cases where the cause is reversed and remanded for insufficient evidence. Plaintiff argues that this *dictum,* in no way necessary to the decision, is contrary to the terms and objectives of the statute, and would render section 75(2)(c) a nullity.

A careful reading of section 75(2)(c) reveals that by its terms it does not limit the right to strike the remanding order to cases where the Appellate Court reverses for insufficient evidence, or for any other particular grounds. The statute is all encompassing, and grants the right to strike the remanding portion of the order *in all cases* where the Appellate Court reverses and remands a cause for a new

trial, provided the party in whose favor judgment was originally entered in the trial court files the requisite affidavit relinquishing the right to a new trial, and stating that he will be unable on a future trial to adduce other or additional evidence.

Not only does the section apply in plain, unequivocal terms to judgments reversed for whatever reason, but it gives the party whose judgment is reversed, and only that party, the right to decide whether to endeavor to eliminate the errors in a new trial, or to finalize the judgment by the procedure provided in section 75(2)(c), and take his chances of securing leave to appeal to this court.

Defendant argues with persistence that it is not only entitled to a reversal of plaintiff's judgment because of alleged errors, but to a new trial that is free from error, and that plaintiff cannot deprive it of that right by invoking section 75(2)(c) where there were errors of law in the trial.

This argument, while appealing as a statement of general principle, has no application to the issues in this case, since defendant, by plaintiff's waiver of a new trial, is deprived of absolutely no rights to which it is entitled. If plaintiff is willing to forego a new trial, in which more evidence may be offered and those errors of law which deprive plaintiff of her judgment may be corrected, then defendant enjoys the potential advantage that the Supreme Court may not grant plaintiff's leave to appeal, in which case the Appellate Court's judgment in defendant's favor is final and disposes of the entire case. If leave to appeal is granted, and the Supreme Court holds that the Appellate Court's interpretation of the law is correct, the judgment in defendant's favor will be affirmed. In that event, defendant, who is spared the burden of a new trial, certainly has no cause to complain.

It is only where the Supreme Court conceivably holds that the Appellate Court erred in its interpretation of the

law respecting the errors of the trial court that defendant could in any way be adversely affected. Under those circumstances, defendant should not have been entitled to the reversal and remandment in its favor by the Appellate Court in the first instance. Furthermore, in this event defendant would eventually have been adversely affected to the same extent, even if the remanding order were not stricken. For, after the so-called errorless trial, based upon the Appellate Court's incorrect interpretation of the law, this court would be still obliged to reverse the judgment.

The only possible advantage of which defendant may be deprived by plaintiff's waiver of a new trial under section 75(2)(c) is the tactical benefits of delay by forcing plaintiff to submit to a new trial, which is scarcely a right of which this court may take cognizance. Defendant cannot in good conscience accept judgment in its favor because of certain errors of the trial court, and at the same time complain because plaintiff is willing to accept the loss of her judgment in order to take the risk of securing review of those questions of law by the Supreme Court. It is therefore apparent that construing section 75(2)(c) according to its plain terms will in no way deprive defendant of any legal rights.

There is another and more cogent reason for rejecting defendant's contention that section 75(2)(c) must be limited only to cases reversed and remanded for insufficient evidence. It is clear from the statute that judgments finalized under section 75(2)(c) can be reviewed by this court only upon the same basis as other petitions for leave to appeal. Under section 92(3)(b) of the Civil Practice Act, the Supreme Court can examine cases brought to it by appeal from the Appellate Court as to questions of law only. Thus, even if a judgment of the Appellate Court is finalized under section 75(2)(c), this court could not review it if it merely raises the sufficiency of the evidence. *Olson* v. *Chicago Transit Authority*, 1 Ill.2d 83.

Judgments reversed and remanded for insufficient evidence ordinarily raise only factual questions relating to the weight of evidence. Nevertheless, defendant would have this court restrict the use of section 75(2)(c) to just such cases, when it is clear that under such circumstances there would be no use for finalizing the judgment since it could never be reviewed by the Supreme Court because of the prohibition in section 92(3)(b).

If the evidence were so insufficient that a question of law would be presented, of which the Supreme Court could take cognizance, the Appellate Court should properly enter a directed verdict in defendant's favor rather than a remanding order, in which case there would be no need to invoke the procedure provided in section 75(2)(c).

It is our opinion, therefore, that the restricted application of section 75(2)(c), suggested in the *Lees dictum*, and asserted by defendant, would render the statute a nullity and utterly defeat its remedial objectives.

It is significant, moreover, that no such limitation has been imposed by the other Appellate Courts under the practice obtaining both prior and subsequent to the enactment of section 75(2)(c).

In *Hartley* v. *Red Ball Transit Co.* 344 Ill. 534, the Appellate Court, as in the instant case, reversed the judgment in favor of plaintiff because of errors of law in the submission of evidence. (259 Ill. App. 229.) With reference thereto the Appellate Court stated at p. 232: "In violation of this rule the contract went to the jury for construction, together with a mass of more or less irrelevant testimony touching the methods of the parties in conducting their business. * * * Complaint is made as to the rulings in evidence and remarks of the court upon the trial. Such errors, if any, will not likely occur upon the next trial." Despite the reversal for errors in the admission of evidence, the Appellate Court, upon plaintiff's motion, supported by an affidavit that plaintiff could not produce further evidence

on a retrial, struck the remanding portion of the order, and the cause was heard by the Supreme Court on plaintiff's petition for leave to appeal.

In *Blanchard* v. *Lewis*, 414 Ill. 515, determined after the enactment of section 75(2)(c), the jury returned a verdict for plaintiff in a suit upon a contract, and the Appellate Court reversed and remanded the cause for a new trial for errors of law. (345 Ill. App. 246.) The Appellate Court stated: "We are, therefore, of the opinion that the admission of testimony having to do with events that occurred prior to the execution of the contract, the various exhibits having to do with the cancellation of powers of attorney, the testimony as to the bonds held by plaintiffs and the testimony as to the improper placement of bids at the tax foreclosure sale, was a clear violation of the Parole Evidence Rule (citations). The trial court erred in overruling plaintiff's objections to this line of testimony and in denying their motions to strike." Notwithstanding such errors of law in the admission of evidence, analogous to those alleged in the instant case, the Appellate Court allowed plaintiff's motion to strike the remanding order under section 75(2)(c) and to have the judgment entered against him. Plaintiff thereafter filed a petition for leave to appeal, which was allowed by the Supreme Court to review such errors of law.

A similar procedure was followed in *Shaw* v. *Courtney*, 385 Ill. 559, and in *Corcoran* v. *City of Chicago*, 373 Ill. 567. It would serve no useful purpose to document this opinion further with all the cases where this procedure was followed. The only reference in the case law limiting plaintiff's right to have the remanding order stricken, as defendant suggests, appears in the *dictum* in the *Lees case*, which, as we have found, was in no way necessary to a proper disposition of that case.

*Patterson* v. *Warfield*, 233 Ill. 147, cited by defendant, has no application to this issue. The court therein construed

a statute different from section 75(2)(c) in that it imposed upon the Supreme Court the duty to weigh the evidence, whereas section 75(2)(c) provides that judgments finalized thereunder should be reviewed on the same basis as other cases authorized for review, and in no way infringes upon the appellate jurisdiction of the Supreme Court.

On the basis of this analysis we believe that according to the literal meaning of the words of section 75(2)(c) the striking of the remanding order is mandatory upon the Appellate Court in all cases where the party whose judgment in the trial court was reversed and remanded files the requisite motion and affidavit. This interpretation renders the section consistent with accepted practice, and effectuates the undoubted legislative intent to streamline litigation and prevent costly and burdensome retrials of cases which may later be found to be predicated upon incorrect law. Consequently, the statute should be construed to achieve this laudable purpose, rather than reflect a hardening of procedural arteries.

Moreover, contrary to defendant's assertion, the imposition of this duty upon the Appellate Court does not interfere with the judicial function any more than any other requirement prescribing the appellate jurisdiction of a court which may properly be designated by the legislature. *Scott v. Freeport Motor Casualty Co.*, 379 Ill. 155.

Defendant contends further that we are without power or authority to issue the extraordinary writs herein to review the Appellate Court judgment. Upon plaintiff's filing a petition for leave to appeal after the cause has been decided by the Appellate Court, it was within our province to determine whether our jurisdiction was properly invoked. Although we have held, as defendant states, that a judgment reversing and remanding a cause for a new trial does not present a final appealable order (*Kavanaugh v. Washburn*, 387 Ill. 204; *Eckhardt v. Hickman*, 2 Ill. 2d 98, 103), nevertheless, where the Appellate Court, in disregard of

the statute, has arbitrarily and contumaciously refused to finalize such order, this court has power in aid of its appellate jurisdiction to issue the appropriate extraordinary writ to bring the record before this court, and determine whether the inferior tribunal has exceeded its jurisdiction or proceeded according to law. *People ex rel. Stead* v. *Superior Court,* 234 Ill. 186; *People ex rel.* v. *Circuit Court of Cook County,* 169 Ill. 201; *People ex rel. Waber* v. *Wells,* 255 Ill. 450, 455; *People ex rel. Modern Woodmen* v. *Circuit Court of Washington County,* 347 Ill. 34.

It has been held that such power is not only inherent, but has been expressly conferred by the statutory provision authorizing this court to issue the extraordinary writs of *mandamus, habeas corpus, certiorari,* error and *supersedas,* and all other writs not prohibited by law which may be necessary to enforce the due administration of justice in all matters within its jurisdiction. Ill. Rev. Stat. 1955, chap. 37, par. 13; *People ex rel.* v. *Circuit Court of Cook County,* 169 Ill. 201.

In the *Cook County Circuit Court case* it was stated: "The grant of the general power to exercise appellate jurisdiction would seem to imply the particular power to issue the writ of prohibition if it is necessary to the exercise of such jurisdiction." The writ was denied in that case only because the original order of the circuit court on the merits had not yet been considered by the Appellate Court, and therefore was not presented for review in the Supreme Court. In the instant case, however, the Appellate Court had entered a judgment on the merits, and plaintiff had filed her petition for leave to appeal from the judgment; consequently, there was a proper basis for the issuance of one of the extraordinary writs in aid of this court's appellate jurisdiction.

In *People ex rel. Stead v. Superior Court,* 234 Ill. 186, it was held that this court may direct the issuance of a writ of *certiorari* to protect its appellate jurisdiction where a

lower tribunal entertained proceedings which were in derogation of a previous Supreme Court determination of the rights of the parties. The court protected its appellate jurisdiction by the issuance of the extraordinary writ of *certiorari,* notwithstanding the fact that the case was no longer pending before it. By the same token, it is equally appropriate that the extraordinary writ of *certiorari* be issued where the exercise of our appellate jurisdiction is jeopardized in the first instance by the arbitrary action of the Appellate Court hampering our consideration of the petition for leave to appeal.

The mere reiteration, in the cases cited by defendant, of the principle that a petitioner seeking the issuance of an extraordinary writ must allege facts showing affirmatively that the petitioner is entitled to the relief asked does not constitute a basis for the denial of relief in the instant case, where it is patent that the action of the Appellate Court operates to usurp the appellate jurisdiction of this court to review questions of law. Admittedly, this court may not grant all petitions for leave to appeal, but the right to refuse such petitions rests with this court, and can neither be abdicated nor usurped by an inferior tribunal under the guise of refusing to strike a remanding order, so that its action is a shield preventing review of its errors.

It is therefore incumbent upon this court to consider the merits of the case and determine whether the Appellate Court erred in its application of the law.

Plaintiff contends first that the Appellate Court erred in its determination of the scope of appellate review of Federal Employers' Liability Act cases; while defendant maintains that the Appellate Court, in reviewing such cases, is in no way deprived of its inherent right to weigh the evidence, as in other cases involving jury verdicts.

It is established that the rights created under this Federal statute, including the right to jury trial which is a substantial part of the relief provided, are governed not

by State law but by the decisions of the Federal courts, in order that the act be given uniform application. Hence, it has been held that such rights cannot be affected by "local rules of procedure." (*Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359; *Brown* v. *Western Railway of Alabama,* 338 U.S. 294.) In this connection the court stated in the *Dice case:* "We also recognize in that case that to deprive railroad workers of the benefits of a jury trial where there is evidence to support negligence is to take away a goodly portion of the relief which Congress has afforded them. It follows that the right to trial by jury is too substantial a part of the rights accorded by the Act to permit it to be classified as a mere 'local rule of procedure.' "

If jury verdicts could be set aside according to local standards and rules of procedure in appellate courts, whereby the evidence is reweighed, as was done in the instant case, then the right to jury trial may be rendered impotent and lose its significance. Consequently, in accordance with the mandate in the *Dice case,* we are bound by the determination of the United States Supreme Court as to the province of the jury in such cases.

The scope of such appellate review of Federal Employers' Liability Act cases has been prescribed by the United States Supreme Court in *Lavender* v. *Kurn,* 327 U.S. 645, where the court stated: "It is true that there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an Appellate Court to weigh

the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. (See Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 68; * * * Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 35. See also Moore, 'Recent Trends in Judicial Interpretation in Railroad Cases Under the Federal Employers' Liability Act', 29 Marquette L. Rev. 73." The court went on to promulgate the rule: "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. *And the appellate court's function is exhausted when that evidentiary basis becomes apparent, * * *.*" (Italics added.)

That decision and rule of law were deemed controlling by the United States Supreme Court in a recent case arising in this jurisdiction and presenting the precise issue involved herein, as appears from the briefs filed in that case. (*Harsh* v. *Illinois Terminal R. R. Co.* 348 U.S. 940.) In the *Harsh case* the Illinois Appellate Court reversed and remanded for a new trial a jury verdict and judgment in favor of an injured employee on the ground that the jury's finding of a violation of the Boiler Inspection Act was against the manifest weight of the evidence. (*Harsh* v. *Illinois Terminal R. R. Co.* 351 Ill. App. 272.) The Appellate Court then allowed plaintiff's motion to strike the remandment portion of the order, but the Illinois Supreme Court denied plaintiff's petition for leave to appeal. However, the United States Supreme Court, on a writ of *certiorari*, reversed the Appellate Court judgment and cited in support thereof *Lavender* v. *Kurn,* 327 U.S. 645, in a memorandum opinion filed after a regular hearing and the submission of briefs.

Although defendant argues that the United States Supreme Court reversed the Appellate Court decision in the

*Harsh case* merely because it differed with the Appellate Court on the weight of the evidence, we are not so naive as to accept the theory that the United States Supreme Court would grant a writ of *certiorari* merely to reweigh the evidence. The briefs and arguments offered in that case at the original hearing, and on the petition for re-hearing, certified copies of which have been filed with this court, presented squarely the issue of the scope of appellate review in a Federal Employers' Liability Act case, and the court in reversing the Appellate Court on the authority of the *Kurn case,* held, in effect, that the Appellate Court was bound by the rule promulgated in that case, and erred in setting aside a jury verdict where there was an evidentiary basis for such verdict.

Moreover, this interpretation is consistent with other decisions of the United States Supreme Court defining the province of the jury and the reviewing court in Federal Employers' Liability Act cases. (*Ellis* v. *Union Pacific Railroad Co.* 329 U.S. 649.) Consequently, in adjudicating the merits of this case the Appellate Court was obliged to determine whether there was an evidentiary basis for the jury verdict.

The bulk of the evidence herein relates to the validity of the release entered into by plaintiff's ward, since the issue of negligence and liability were not disputed by defendant. The validity of that release, however, must be determined, not on the basis of local rules pertaining to fraud cited by defendant and the Appellate Court, but in accordance with the standard imposed by Federal laws under which such releases are scrutinized to be sure that they are not tainted by fraud or overreaching. Releases necessarily are a part of the administration of the Federal act and their validity must be determined according to the uniform Federal law. *South Buffalo Railway Co.* v. *Ahern,* 344 U.S. 367; *Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359; *Marshall* v. *New York Central*

*Railroad Co.* 218 F.2d 900; *Graham v. Atchison, Topeka and Santa Fe Railway Co.* 176 F.2d 819.

In *Graham v. Atchison, Topeka and Santa Fe Railway Co.* the Federal court quoted: "No release of this nature should be upheld if any element of fraud, deceit, oppression or unconscionable advantage is connected with the transaction. And in passing on the validity of such release when assailed all surrounding conditions should be fully developed and the relative attitude of the contracting parties clearly shown so that the jury in the clear light of the whole truth may rightly decide which story bears the impress of verity."

Inasmuch as both parties adduced an imposing array of witnesses, it will not be possible to summarize the testimony of each witness, but reference will be made to the tenor of their testimony in reviewing the sequence of events.

The occurrence in which plaintiff's ward was injured took place about 3:50 P.M., May 22, 1948, in the vicinity of Brown, Illinois, on the single-track line of defendant's railroad running between Evansville, Indiana, and Mattoon, Illinois. An extra train on the track, carrying some fifty cars, stopped in the vicinity of milepost 182, although there was no station there, and the flagman stated that he did not know what caused the train to stop. Train 296, on which plaintiff's ward, Charles Dale Bowman, was fireman, was traveling behind the extra train. When the engineer of train 296 saw the stopped train ahead, he set the air brakes in emergency, and told the men in the locomotive cab to get off. Being nearest the exit, Charles Dale Bowman jumped first, while the train was going about 35 miles per hour. The head brakeman jumped next, and then the two trains collided.

Shortly thereafter, Bowman was found at milepost 182, unconscious and bleeding from the head. He was taken to the Olney Sanitarium at about 5:15 P.M., unconscious, and

was given close attention by the railroad doctor. It is not clear from the record just how long he remained unconscious, but it was at least until the fourth day. He was visited immediately thereafter by attorney H. J. Hasch, who later represented him in the execution of the release.

On June 15, 1948, examination by the attending doctor showed that Bowman was able to carry on a conversation with some aphasia. There was a weakness on the right side of his face and a sluggishness of the right pupil to reaction to light. X-ray films in June showed fractures of the 4th and 5th ribs with pleural infection and hemorrhages, and multiple fracture of the frontal skull bone, running in all directions, as well as a depressed fracture, indented ¼ to ½ inch, of the entire bone above the eye level. In this connection it appears that X rays taken on September 11, 1951, showed that this fracture of the frontal bone healed in a permanently depressed state. The depression of the skull in the frontal area could be felt with the hands. There was medical evidence that this injury exerted pressure upon the frontal lobes of the brain, which are the seat of the higher thought processes and which thus exert a special influence over the behavior and intelligence of the individual.

The report submitted on June 23, 1948, by the attending doctor, employed by the railroad, stated that it was possible that there was central nervous system residual, but he was unable to so state at the time; that the patient had not fully recovered; that he was unable to state with any degree of accuracy how much more treatment would be required; that the prognosis as to complete recovery to normal is questionable; and that a thorough neurological examination should be given the patient to evaluate the cerebral nervous system damage.

On June 28, 1948, Bowman was taken in an ambulance from the Olney Sanitarium to the railroad hospital in Chicago by the railroad claim agent. While he was hospitalized,

Bowman failed to recognize either his mother or sister, or other persons who had known him for many years. Bowman was married on July 3, 1948, apparently to a new acquaintance. On July 6, 1948, Harry G. Seibert, the district claim agent, with knowledge that Bowman had a claim pending against the railroad, took Bowman to the law firm in Mattoon which ordinarly represented the railroad, so that Bowman could consult with one of the firm lawyers concerning a replevin suit against his mother for his car, which apparently had been in her possession.

It appears further that on July 10, 1948, Bowman came to the back door of his sister's home, accompanied by a man who helped him walk. According to her testimony, Bowman's talk was rambling, his tongue thick and he had a stary look in his eyes. She refused, because of his condition, to give him the keys to the car.

The neurosurgeon, Dr. Oldberg, who saw Bowman at the request of the railroad chief surgeon, on July 13, 1948, reported that he felt that Bowman had not yet returned to his normal state, and recommended on August 25, 1948, that Bowman should be hospitalized for observation. Defendant's chief surgeon, Dr. Guy, stated in a report on the same date that Bowman manifested unusual mannerisms, a staggering gait, and slurring speech, and that he could not raise his right arm fully, and the report recorded him as a psychiatric problem and recommended that he be seen by a psychiatrist. Bowman was also examined at this time by Dr. Madden, a neurologist. He testified from his report to the company dated August 28, 1948, in which he found Bowman beset with a memory difficulty and with a judgment naive in character. He ventured only a tentative diagnosis of a post-concussion syndrome of moderate degree. During the months of July, August and September, including the time at which the release was signed, Bowman was under the care of Drs. Link and Zinschlag at Mattoon, Illinois. At the time of the trial, Dr. Link was

deceased. Dr. Zinschlag was alive and practicing in Mattoon, but was not called as a witness by the defendant.

With reference to Bowman's conduct during the summer months of 1948, a number of witnesses who had known Bowman and the family for many years testified that when they saw him after his injury he would repeat things over and over, that his appearance was like that of a child, that he would laugh without any apparent cause, and that it was difficult for him to find words.

The police captain testified that he found Bowman lost, sitting on the porch of a home. The man who rented the apartment to Bowman and his wife in July, 1948, testified that he noticed that Bowman was very nervous, that his conversation was clipped and hardly understandable, and that from his frequent observations of Bowman while he resided there between July and December, 1948, it was the witness's opinion that Bowman was not capable of entering into any business transactions.

In the latter part of August, 1948, Bowman and his wife went to the home of Marcus Glenn Stevens, of the Brotherhood of Locomotive Firemen and Enginemen, whose duties involved settling claims for union members who requested help. Stevens made appointments for Bowman with Dr. Link, and with Seibert, the railroad claim agent. When Stevens arrived at Seibert's office, the found that Bowman was represented by Hasch. According to the latter's testimony, he was employed by Bowman some three or four days after the railroad collision, while Bowman was in the hospital at Olney. Hasch also testified that Bowman came to him the early part of September, 1948, and said he believed he could get a settlement and wanted Hasch's help. Bowman, Hasch and Seibert discussed a settlement, but no agreement was reached. After Hasch and Bowman went out for a ride, they arrived at a figure of $15,000, from which Hasch was to get a fee of $2000. According to his testimony, Hasch had never taken a statement of the

case, nor interviewed a witness, and regarded as not very important the report he had received from Dr. Weber stating that Bowman had not returned to normal and recommending further examination.

Hasch and Bowman informed Seibert of their agreed demand, and Seibert telephoned the Chicago office and received immediate authority to settle. At 9:00 A.M., September 18, 1948, Bowman and Hasch returned to Seibert's office, where he prepared a release and resignation of Bowman as an employee of the defendant railroad. The documents, however, were executed in the conference room of the Central National Bank of Mattoon, in which building the railroad attorneys had their offices. Present on that occasion were Bowman, Hasch, Seibert, the railroad counsel, and three female clerks.

The release differed from the regular release form in that it included a specific description of the accident; it was signed by both Bowman and Hasch, and contained a certification by two witnesses that it was read over and fully explained to Bowman by his attorney and assented to by both of them. Defendant's claim agent, a man of 31 years experience, stated that on no other occasion had the claim of an injured person, not yet in suit, been disposed of with a representative of the railroad's local law firm present.

The draft, payable to Bowman and Hasch, was delivered, and Bowman, after asking for $2730 in cash, paid Hasch $2000 and $75 to attorney J. E. Horsley for his services in the replevin suit. The witnesses present at the signing, called up from the bank, testified for defendant that they thought Bowman was mentally competent to conduct business. Some of them admitted, however, that they did not hear Bowman speak.

With reference to Bowman's conduct after the execution of the release, defendant offered evidence that within a few weeks Bowman paid the balance due on his automo-

bile, a $200 garage bill, bought a new car and trailer, which he later traded for a more modern one, and that in January, 1949, he sold a refrigerator. Defendant also offered testimony of several persons who saw Bowman in the latter part of 1948 and 1949 in the American Legion Hall, who stated that he acted normally.

Bowman's sister, however, testified that when she visited him in his trailer camp in December, 1948, he did not recognize her at first. He wondered where he was, was unable to carry on a conversation, went from one subject to another, and had difficulty finding words. She was not sure he was married, and his purported wife was not the kind of person with whom she would ordinarily associate.

Plaintiff testified that in January, 1949, Bowman returned home, acted like a ten-year old child, and she had to shave and wash him. Bowman was confined at the VA Hospital from July 8, 1949, until December 17, 1949. During his subsequent trial visits at home, plaintiff could not longer reason with him, and had him put in the Jacksonville State Hospital in 1951. She also adduced evidence that there was no history of mental illness in the Bowman family, and that he was in good health and mentally normal prior to the injury. Her testimony was corroborated by that of persons who worked with Bowman, and others who saw him prior to his injury, and by the fact that Bowman's physical examination by defendant at the time he was hired revealed no disability.

The medical history subsequent to the execution of the release reveals that in April and May of 1949 Bowman sought treatment at the neurosurgical clinic at Washington University, where he saw Dr. Winokur, who testified for defendant that he found definite brain damage, but no abnormality in thought processes. However, on July 8, 1949, the county court ordered that Bowman be committed to the VA Hospital in Danville for mental treatment. On August 14, 1951, an electro-encephalographic examination

at the Jacksonville State Hospital indicated brain damage in the left hemisphere, and other examination at the hospital revealed paralysis of the right arm and leg, with abnormal reflexes, a weakness of the right side of the face, impairment of his speech and memory, and a diagnosis that he was suffering from a mental illness due to an organic brain injury.

On August 7, 1952, Bowman was adjudicated a mentally ill person incapable of caring for his own estate, and was ordered committed to the Department of Public Welfare for admission to the Jacksonville State Hospital, where he was found to be physically and mentally handicapped, particularly with reference to the right side of his body. He has been under doctor's care in the State hospital since 1952 and no improvement noted.

Dr. Siegel, who examined him in November, 1953, testified to many of the same mental and physical findings, and it was his opinion that the conditions which he found were permanent; that Bowman was incompetent from July, 1948; and that the occurrence in question was sufficient to cause the present state of ill-being in a hypothetical person.

Defendant introduced the testimony of two physicians and some seventeen lay witnesses to establish that Bowman was competent to transact business at the time of the settlement. From this evidence, it is clear that defendant knew Bowman had sustained a severe head injury and that his faculties were in the process of deterioration at the time the release was signed. After receiving the report of the first doctor concerning the gravity of Bowman's condition, it was advised in July by a neurosurgeon that the man had not yet returned to normal, and less than a month before the signing of the release this same doctor recommended hospitalization. So also a few weeks before the formal signing occurred, a company surgeon found that certain changes of significance were taking place so as to make Bowman a psychiatric problem. Indeed, in August

and September, defendant's own claim agent was concerned as to whether or not Bowman had the mental ability to sign a release. At the time the release was signed Bowman was still under the care of defendant's district doctor, who did not testify, although available.

Unless the testimony of Bowman's mother, sister, and many other persons who knew him before his injury, and saw him afterward, is disregarded, Bowman's failure to recognize his kin and friends, his halting speech, incoherent conversation, childish ways, euphoric attitude, and other symptoms of abnormality, together with the medical testimony of brain damage, constitute an evidentiary basis for the jury to find that he was not mentally competent at the time he executed the release.

That evidence, coupled with the further facts that defendant settled for $15,000 a case in which it regarded itself as liable, and in which the jury subsequently awarded $200,000 damages, that this settlement was made just three months after Bowman sustained multiple and depressed skull fractures, with knowledge from defendant's own medical reports of Bowman's brain damage, the full extent of which was not yet discernible, as well as knowledge of his peculiar behavior in suing his mother and marrying an apparently new acquaintance three days after being transferred by ambulance from the hospital at Olney, tends to indicate that this settlement was by no means free from overreaching.

Nor is that inference rebutted by the fact that Bowman could count out the cash to pay his zealous attorney, or sign his name to some checks made out by others; or by the fact that Bowman was represented by counsel, particularly that counsel was engaged some four days after the occurrence, when Bowman had barely regained consciousness, and such counsel admitted that he never investigated the case, nor interviewed witnesses, and disregarded the report of the attending doctor that Bowman had not recov-

ered and needed a thorough neurological examination to ascertain the damage to his nervous system.

It is therefore clear, when "all surrounding conditions" are developed and the "relative attitudes of the contracting parties clearly shown," as required by the *Graham case,* that there was ample evidentiary basis from which the jury could find that there was some overreaching by defendant in procuring the release. The evidence was scarcely contradicted that Bowman was in a very serious mental condition which was caused by the admitted negligence of the defendant company. Three different doctors employed by the railroad had indicated in their reports that Bowman was not well mentally and that the prognosis, to say the least, was uncertain.

Morover, the Appellate Court's attempt to isolate the issue of the validity of the release from the main case, in the order for a new trial, particularly where defendant did not request a severance in its briefs, is not only highly prejudicial to plaintiff's rights, but is contrary to law. As hereinbefore noted, the validity of the release is "but one of many interrelated questions," (*Dice v. Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359,) and that "in passing upon the validity of such release when assailed, all surrounding conditions should be fully developed and the relative attitudes of the contracting parties clearly shown, so that the jury in the clear light of the whole truth may rightly decide which story bears the impress of verity." *Graham v. Atchison, Topeka and Santa Fe Railway Co.* 176 F.2d 819.

Thus, in the case at bar, the $15,000 settlement would be evaluated in a different light when it is shown that it was paid, not as a compromise of liability, but under circumstances of undisputed liability. Similarly, Bowman's competency at the time of the execution of the release can be better ascertained when the circumstances of the injury and sequence of treatment are known. Even the circum-

stances of the employment of Bowman's counsel and his conduct of the case cast light in determining the validity of the release negotiated and urged by that counsel. In our judgment, the truth respecting the release can only be ascertained by considering the cause in its entirety, otherwise Federal rights will be prejudiced. Again the Appellate Court was in error in exercising original jurisdiction on a question not properly before it.

The Appellate Court's opinion further refers to a host of errors of the trial court in the admission and rejection of evidence. The court held as error the admission of the opinion evidence on the mental competency of Bowman by plaintiff's lay witnesses McCoy, Foster, the police captain Ed Horn, and Hilton, even though they knew him for years prior to the injury, had occasion to see and talk to him after the injury, and described the way he appeared and acted. The court, however, found no objection to the opinion evidence on the competency of Bowman by defendant's witnesses Myrtle Swaim and Betty Armentrout, who saw Bowman for the first time when the release was executed, and who did not hear him speak a word, and who testified that he was normal and mentally competent. Nor did the Appellate Court object to the testimony of Clarence Miller respecting Bowman's mental capacity, although he did not know Bowman until the latter part of 1948 and 1949, when he saw him at the American Legion Hall.

Inasmuch as it is established that a lay witness may express an opinion as to mental competency (*DeMarco* v. *McGill*, 402 Ill. 46, 56; *Tyler* v. *Tyler*, 401 Ill. 435,) and since it appears from the record that plaintiff's witnesses sufficiently described the behavior on which their opinions were based, the admission of this testimony was not error.

The Appellate Court further objected to statements characterizing Bowman's behavior as childish, or like a child with a new toy, or like a ten-year-old child, on the ground that they were conclusions. However, this court

has permitted descriptions of behavior despite the objections that they were mere conclusions, particularly where, as in the instant case, the characterizations are accompanied by descriptions of the context in which the behavior was set, (*People* v. *Hauke,* 335 Ill. 217; *People* v. *Hamilton,* 268 Ill. 390,) and such rulings are in accordance with the general rule with reference to nonexpert opinions on the mental state of persons. 20 Am. Jur. sec. 823.

Nor is it clear to this court why the Appellate Court held that the testimony of policeman Horn was hearsay and erroneously admitted, when this witness testified from his own observation that he saw Bowman watching people while walking behind them, and that such persons complained to the witness, and that when he told Bowman about the complaints the latter would apologize to him.

The Appellate Court also held as error the refusal by the trial court to admit in evidence eleven checks signed by Bowman after the execution of the release, offered by defendant as evidence of Bowman's comprehension to engage in business transactions. The checks, however, were written in another hand, or typewritten, and were merely signed by Bowman. To be material on the issue of his competency, it would have to be shown that they were Bowman's acts, since it would tend to show incompetency rather than competency if someone else were attending to his business affairs and merely presenting him with checks to sign. It would be difficult to conceive this omission as prejudicial error. All of Bowman's activities, what he did, including transactions of any business, were described in detail.

The Appellate Court further held that the trial court erred in excluding Hasch's testimony of the "settlement" negotiations. Not only are matters relating to offers of compromise ordinarily inadmissible, (*Fenberg* v. *Rosenthal,* 348 Ill. App. 510, 517,) but it is patent that the omission of such testimony would not constitute prejudicial error

in view of Hasch's relation to the case. The circumstances of his procuring Bowman's case, his failure to conduct any investigation on behalf of his client, or to ascertain the extent of his client's injuries at the time he urged "settlement," even though he knew from the reports of defendant's own doctors that his client had not recovered and that he evidenced mental abnormality, rendered Hasch's testimony of limited, rather than decisive, value. Furthermore, the record does contain an ample measure of Hasch's testimony respecting the circumstances of the settlement; how Bowman decided to take the offer after he went for a ride with Hasch; how the figure of $15,000 was arrived at; and how he (Hasch) agreed to take $2000 for his services. Were we to be technical, we could point out that this so-called error is not properly before us, since there is no offer of proof and only a colloquy between defendant's counsel and the court.

The Appellate Court also stated that reversible error was committed by the trial court in allowing plaintiff's witness, Dr. Berdach, to testify on the basis of subjective symptoms. The criterion as to whether a doctor may testify to subjective symptoms is whether the examination is made for the purpose of trial or for treatment, (*Shell Oil Co.* v. *Industrial Com.* 2 Ill.2d 590; *Cuneo Press Co.* v. *Industrial Com.* 341 Ill. 569, 572,) and since the record shows that the examination was part of the routine diagnostic procedure followed by the Jacksonville State Hospital preparatory to treatment, even though Bowman left the hospital at that time before treatment could be administered, the testimony of the doctor was properly admitted by the trial court.

Nor can we agree with the Appellate Court's holding that the trial court should have allowed defendant's motion to strike a portion of Kenneth Green's testimony on the ground that it was not proper impeachment. Inasmuch as defendant made no objection to such testimony until

after cross-examination, when a motion to strike was made, the motion was properly overruled. (*Chicago Union Traction Co. v. May,* 221 Ill. 530.) Moreover, the Appellate Court assigned a different reason for holding the testimony improper from that asserted by defendant when it belatedly made its complaint.

In adjudicating this appeal and ancillary motion, we have been obliged to consider numerous questions of law relating both to our appellate jurisdiction and to the merits of the cause. As we have heretofore indicated, the jury, in answering the defendant's specific interrogation, found Bowman to be incompetent at the time the release was executed. The plaintiff contends that since the railroad failed to file a motion to set aside this finding, nor did it file a specific objection seeking relief from the special verdict, that the jury's verdict predicated upon the finding is unassailable. In view of our conclusion on the more important issues, we deem it unnecessary to resolve this contention. We have found that the Appellate Court erred in refusing to strike the remanding portion of its order in accordance with the mandatory requirement of section 75(2)(c) of the Civil Practice Act; that we may properly issue the extraordinary writ of *certiorari* in aid of our appellate jurisdiction herein; that contrary to the determination of the Appellate Court the scope of review of a jury verdict in a Federal Employers' Liability Act case is governed by Federal law and is limited to determining whether there is an evidentiary basis for the jury verdict, and that in the instant case there was an evidentiary basis for holding that the release interposed by defendant as a defense in this cause was tainted with overreaching and fraud, as defined by the Federal courts in Federal Employers' Liability Act cases; and that the Appellate Court erred in numerous assignments of error in the admission and rejection of evidence by the trial court. Consequently, we are constrained to reverse the judgment of the Appel-

late Court, and in accordance with the power conferred by section 92 of the Civil Practice Act, to reinstate the judgment of the circuit court of Cook County in favor of plaintiff.

*Appellate Court reversed; circuit court affirmed.*

SCHAEFER, HERSHEY, and DAVIS, JJ., dissenting:

We concurred in the unusual procedure by which this case was brought to this court, because of doubts we then entertained as to whether the Federal Employers' Liability Act required any change in our appellate procedure in reviewing jury verdicts.

In this case the plaintiff based his motion to strike the remanding order on section 75(2)(c) of the Civil Practice Act (Ill. Rev. Stat. 1955, chap. 110, par. 75(2)(c)). But the Appellate Court found that new trial should be ordered because of numerous errors which, in its opinion, deprived the defendant of a fair trial. In such a case, it is clear that the Appellate Court is not obliged to strike its remanding order, and this court has so held. (*Lees* v. *Chicago and North Western Railway Co.* 409 Ill. 536.) We there held that the statute did not apply to a case where the question involved was the competency of evidence offered by the defendant to establish a defense, but excluded in the trial court. The Appellate Court ruled specifically that the trial court erred (1) in allowing plaintiff's lay witnesses to express an opinion as to Bowman's competency without a proper foundation being laid, (2) in permitting plaintiff's witnesses to testify to conclusions instead of facts from which the jury could properly evaluate the testimony and draw inferences from facts, (3) in admitting hearsay testimony, (4) in refusing to receive in evidence 11 checks issued by Bowman on the bank account established with proceeds of his settlement and used by him in various important business transactions, (5) in rejecting the testimony of Bowman's lawyer regarding conversations with Bowman during settlement negotiations, (6) in permitting phy-

sicians to testify to subjective symptoms, (7) in permitting the plaintiff to attempt the impeachment of a defense witness on objectionable matters elicited on cross-examination, (8) in requiring defendant's claim agent to testify regarding the customary fee in contingent cases, and (9) in considering before the jury whether the defendant's officers had complied with a certain *subpoena duces tecum.* Because of the foregoing, the Appellate Court did not deem it necessary to discuss alleged errors relating to the conduct of plaintiff's counsel, the refusal of tendered instructions, and the amount of the verdict. We are convinced this court did not have authority to require the Appellate Court to strike its remanding order. Therefore, it is our opinion that leave to appeal was improvidently granted and we are without jurisdiction in the case.

We also dissent from the court's holding that the Federal Employers' Liability Act has abrogated the traditional jurisdiction of our reviewing courts to set aside verdicts as being contrary to the manifest weight of the evidence. That jurisdiction is not only expressly granted by section 92(3)(b) of the Civil Practice Act, but is also a fundamental part of our procedure in the trial of jury cases under the common law. (*Olson* v. *Chicago Transit Authority,* 1 Ill.2d 83; *Corcoran* v. *City of Chicago,* 373 Ill. 567.) It in no way invades the traditional function of the jury, and has been embodied in our statutes for more than 100 years. (Ill. Rev. Stat. 1845, chap. 83, sec. 22; Laws of 1908, p. 460, sec. 83; *Mitchell* v. *Louisville and Nashville Railroad Co.* 375 Ill. 545, 551; *Corcoran* v. *City of Chicago,* 373 Ill. 567, 571-574; *Voigt* v. *Anglo-American Provision Co.* 202 Ill. 462, 465-466; *Chicago and Rock Island Railroad Co.* v. *McKean,* 40 Ill. 218, 221-222.) It is neither the prerogative, nor the intent, of Congress to regulate the jurisdiction of State courts, nor to control and affect their modes of procedure. *Herb* v. *Pitcairn,* 324 U.S. 117, 120, 89 L. ed. 789, 791; *Brown* v. *Gerdes,* 321 U.S.

178, 189, 88 L. ed. 659, 666; *Missouri* v. *Lewis*, 101 U.S. 22, 30, 25 L. ed. 989, 992; *Second Employers' Liability Cases*, 223 U.S. 1, 56, 56 L. ed. 327, 348.

Nevertheless, the opinion of the court has ordered the Appellate Courts of this State to retreat from their time-honored jurisdiction and abdicate the duties imposed on them by the Illinois legislature and the common law because of nebulous dicta contained in certain decisions of the United States Supreme Court. We have examined the cases cited by the court, as well as four recent cases, (*Rogers* v. *Missouri Pacific Railroad Co*. 352 U.S. 500, 1 L. ed.2d. 493; *Webb* v. *Illinois Central Railroad Co.* 352 U.S. 512, 1 L. ed.2d 503; *Senko* v. *LaCross Dredging Corp.* 352 U.S. 370, 1 L. ed.2d 404; *Ferguson* v. *Moore-McCormack Lines, Inc.* 352 U.S. 521, 1 L. ed.2d 511,) and find that they involved final judgments which had been entered either taking the case from the jury, or reversing the jury verdicts without a remand. They did not involve the historical attribute of the common-law jury trial which permits a court to weigh the evidence and remand for a new trial. In short, these cases all involved a legal question of how much evidence is required under the Federal Employers' Liability Act to make out a *prima facie* case. They did not involve the procedural method of review and the supervision of the jury verdicts.

The present decision of our court reads into the memorandum of reversal in *Harsh* v. *Illinois Terminal Railroad Co*. 348 U.S. 940, 99 L. ed 736, a mandate to abolish a substantial part of our local jury procedure and to abandon the statutory duties created by our legislature. We believe that such conclusion is totally unwarranted, and deny that it is "naive" to assume that the United States Supreme Court would reweigh the evidence on *certiorari*. We rather suggest that to be the most logical interpretation of its opinion. See *Rogers* v. *Missouri Pacific Railroad Co.* 352 U.S. 500, 1 L. ed.2d 493; *Neese* v. *Southern Railway Co.*

350 U.S. 77, 100 L. ed. 60; Certiorari Policy in FELA cases, 69 Harv. L. Rev. 1441.

We conclude that the court is over-cautious in believing that Congress has stricken down the procedural rights of State courts. Such a serious impingement upon the rights and powers of State courts should require a positive expression. When dealing with our traditional and historical legal procedures, we should be slow to find some unspoken compulsion of Federal law requiring their abolishment. Cf. *Missouri ex rel. Southern Railway Co.* v. *Mayfield,* 340 U.S.1, 95 L. ed. 3.

We find nothing in *Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359, 96 L. ed. 398, to sustain this opinion. That case involved the validity of a release, and under Ohio procedure, such defense was tried solely by the court, without a jury. The vice condemned in that case was that Ohio "provided jury trials for cases arising under the federal Act but seeks to single out one phase of the question of fraudulent releases for determination by a judge rather than by a jury." The United States Supreme Court merely determined that the right to a jury trial may not be denied *"in the manner that Ohio has here used."* It is further clear that the Ohio court applied a State rather than a Federal standard to the evidence necessary to overcome a release. (*Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359, 96 L. ed. 398.) The narrow scope of the opinion is further evidenced by the court's reconciliation of *Minneapolis & St. Louis Railroad Co.* v. *Bombolis,* 241 U.S. 211, 60 L. ed. 961, holding that a State may provide for trial of cases under the act by a nonunanimous verdict. *Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359, 363, 96 L. ed. 398, 404.

In *Missouri ex rel. Southern Railway Co.* v. *Mayfield,* 340 U.S. 1, 5, 95 L. ed. 3, 8, Mr. Justice Frankfurter speaking for the court, tersely expressing that court's attitude toward the excessive anxiety of State courts with reference

to their obligations in cases arising under the Federal Employers' Liability Act, stated: "Therefore, if the Supreme Court of Missouri held as it did because it felt under compulsion of federal law as enunciated by this Court so to hold, it should be relieved of that compulsion. It should be freed to decide the availability of the principle of forum non conveniens in these suits according to its own local law. To that end we vacate the judgment of the Supreme Court of Missouri and remand the cause to that Court for further proceedings not inconsistent with this opinion." The thought there expressed, regarding the availability of the principle of *forum non conveniens* according to local law, is applicable here to the question of local Appellate Court procedures.

---

Upon denial of a petition for rehearing the following additional opinion was filed:

Per CURIAM: Upon reconsideration of this cause pursuant to defendant's petition for rehearing, and the brief of *amici curiae* in support thereof, we wish to supplement our opinion to include the recent decisions of the United States Supreme Court which further substantiate our conclusions respecting the scope of appellate review of Federal Employers' Liability Act cases. In *Rogers* v. *Missouri Pacific Railroad Co.* 352 U.S. 500, 1 L. ed.2d 493, and *Webb* v. *Illinois Central Railroad Co.* 352 U.S. 512, 1 L. ed.2d 503, the United States Supreme Court, in accordance with its disposition to allow *certiorari* in a great number of such cases (69 Harv. L. Rev. 1441, 1450,) reaffirmed its consistent policy of construing the act to require a broadening of the jury's function.

In the *Rogers case* the Supreme Court of Missouri reversed and set aside a jury verdict awarding petitioner damages in a Federal Employers' Liability Act case upon the ground that the petitioner's evidence did not support the finding of the jury as to the railroad's liability. The United

States Supreme Court reversed the Missouri Supreme Court, and explained that *certiorari* was granted in such a large percentage of Federal Employers' Liability Act cases because State courts deprived litigants of their right to a jury determination by failing to recognize that Federal Employers' Liability Act negligence actions are different from ordinary common-law negligence cases, and by not giving proper scope to the jury trial. The court emphasized that the jury trial is an integral part of the Congressional scheme, under which the verdict of the jury is decisive in all but the infrequent cases where reasonable men would not differ as to whether there was any evidence in support of the claim.

The court also noted that although the jury trial feature of the Federal Employers' Liability Act is not approved by those who would prefer a workmen's compensation act for railroad workers, nevertheless, inasmuch as Congress has not seen fit to abandon the present scheme, the court is obliged to effectuate the present Congressional intent by granting *certiorari* to correct instances of improper administration of the act, and to prevent its erosion by "narrow and niggardly construction." The court stated: "The kind of misconception evidenced in the opinion below, which fails to take into account the special features of this statutory negligence action that makes it significantly different from the ordinary common-law negligence action, has required this Court to review a number of cases. In a relatively large percentage of the cases reviewed the Court has found that lower courts have not given proper scope to this integral part of the congressional scheme. We reach the same conclusion in this case. The decisions of this Court after the 1939 amendments teach that the Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury."

The *Rogers case* was cited with approval in *Webb* v. *Illinois Central Railroad Co.* decided the same day, where the court reversed the judgment of the Court of Appeals which had set aside a jury verdict and reversed an award by the Federal District Court for damages under the Federal Employers' Liability Act.

These decisions are in accordance with *Lavender* v. *Kurn,* 327 U.S. 645, 90 L. ed. 916, and the other United States Supreme Court authorities cited in our original opinion. As noted therein, the court in the *Kurn case* promulgated the rule that the Appellate Court's function is exhausted where there is an evidentiary basis for the jury's verdict, and stated:

"Under these circumstances [where the facts and inferences were conflicting] it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. * * * Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

In the face of this mandate we cannot perceive how defendant can argue with conviction in the petition for rehearing that the United States Supreme Court apparently did not really mean what it said, and that the Illinois Appellate Court still retains its right to reweigh conflicting evidence and remand a Federal Employers' Liability Act case because it finds the jury verdict to be against the weight of the evidence. It is obvious that by such action the Appellate Court is substituting its judgment for that of the jury, just as it is when it directs a verdict, and consequently is invading the province of the jury, as defined in the foregoing United States Supreme Court cases.

However, defendant and the dissenting opinion herein endeavor to distinguish these decisions by limiting their application to directed verdict cases. Such an interpreta-

tion would not only distort the unequivocal language of the United States Supreme Court, but has already been rejected by that court in *Harsh* v. *Illinois Terminal Railroad Co.* 348 U.S. 940, 99 L. ed. 736. Defendant, in its petition for rehearing, summarily dismisses that decision as ambiguous, and *amici curiae* claim it merely involved a reweighing of the evidence by the Supreme Court.

In the *Harsh case* the Illinois Appellate Court (351 Ill. App. 272) reversed and remanded a Federal Employers' Liability Act case on the ground that the jury verdict in favor of the employee was manifestly against the weight of the evidence, and for errors of law, as in the instant case. In justifying its action of weighing the evidence, the Appellate Court stated, at page 282:

"On petition for rehearing plaintiff contests, for the first time, the power of a reviewing court to consider the weight of the evidence in F. E. L. A. cases and to reverse and remand a judgment as against the manifest weight of the evidence. It is contended that once such court determines that there is sufficient evidence in the record to support submitting the issues to a jury, it has exhausted its function with respect to weighing the judgment against the evidence. Numerous cases are cited and relied upon, principally *Lavender* v. *Kurn,* 327 U. S. 645, 90 L. ed. 916, 66 S. Ct. 740; *Ellis* v. *Union Pacific Railroad Co.* 329 U.S. 649, 91 L. ed. 572, 67 S. Ct. 598; *Tennant* v. *Peoria & Pekin Union Railway Co.* 321 U.S. 29, 88 L. ed. 520, 64 S. Ct. 409; *Williams* v. *New York Central Railway Co.* 402 Ill. 494. * * * All of these cases deal with the questions of directed verdicts or judgments notwithstanding the verdicts and not with the reversal and remandment on the ground of a verdict against the manifest weight of evidence.

"Standing alone, language from these opinions appears to lend force to plaintiff's argument. However, considering each case in its entirety, it becomes apparent that they do

not support plaintiff's position. In virtually all of them the reviewing court does in fact carefully detail and consider the evidence. Where it was felt the trial court or a reviewing court weighed conflicting evidence, or considered inferences as true which a jury had already rejected, the lower court's action in taking the case from the jury was disapproved. * * *

"Plaintiff has cited no authority, and we find none, which removes the reviewing court's historical power to reverse and remand a case for a new trial when it believes the verdict to be against the manifest weight of the evidence. The cases cited do illustrate the reluctance of the reviewing courts to disturb findings on issues that are based on credibility of witness. We find in these authorities, however, no such restricted rule of law * * *."

The United States Supreme Court granted *certiorari* to review this decision, and the briefs and arguments submitted in that proceeding presented the precise issue of the scope of appellate review in such cases, and whether the *Kurn case* was determinative.

The decision of the Illinois Appellate Court was reversed by the United States Supreme Court, which cited *Lavender* v. *Kurn* as the sole authority. If the United States Supreme Court merely differed with the Appellate Court on the weight of the evidence, as defendant and *amici curiae* contend, there would have been no need to cite *Lavender* v. *Kurn,* or any other case. Furthermore, since the Illinois Appellate Court had specifically rejected that case as an authority in its opinion, by advancing the same arguments as defendant has interposed herein, the action of the Supreme Court, in reversing the Appellate Court solely on that authority, which had been cited only in connection with this issue, signifies unmistakably that the *Kurn case* admitted of no such refinement as the Appellate Court endeavored to impose, but was applicable to the *Harsh case,* where the verdict of the jury was set aside as against the

manifest weight of the evidence, as well as to directed verdict cases.

This interpretation of the *Harsh case* has been recognized and accepted by the Illinois Appellate Court for the Fourth District in the recent case of *Pennell* v. *Baltimore & Ohio Railroad Co.*, decided January 28, 1957, where the court stated: "The limited scope of review in railroad cases as set forth in the *Lavender case, supra,* is likewise determinative of any issue turning on the weight of the evidence. (*Harsh* v. *Illinois Terminal Railroad Co.* 351 Ill. App. 272, rev. 348 U.S. 940, rehearing denied, 348 U.S. 977.)"

This interpretation is in no way contradicted or limited by *Neese* v. *Southern Railway Co.* 350 U.S. 77, 100 L. ed. 60, cited by *amici curiae*. On the contrary, insofar as the United States Supreme Court held that the Court of Appeals erred in disturbing the action of the trial court, which was not without support in the record, this case tends to support plaintiff's, rather than defendant's contentions on this issue.

Nor is our conclusion affected in any way by *Corcoran* v. *City of Chicago,* 373 Ill. 567, or the other Illinois cases cited by the *amici curiae,* inasmuch as those cases do not involve the Federal Employers' Liability Act, and consequently are not governed by the law set forth in the decisions of the United States Supreme Court respecting the scope of appellate review of jury verdicts in such Federal Employers' Liability Act cases.

Nor can defendant find support for its contention in the observations of Justice Frankfurter respecting the rights of State courts generally, inasmuch as Justice Frankfurter's interpretation of the applicability of State court rules in Federal Employers' Liability Act cases has represented for some years the minority view of the United States Supreme Court. *Brown* v. *Western Railway of Alabama,* 338 U.S. 294, 94 L. ed. 100; *Dice* v. *Akron, Canton & Youngstown Railroad Co.* 342 U.S. 359, 96 L. ed. 398; *Rogers* v. *Mis-*

*souri Pacific Railroad Co.* 352 U.S. 500, 1 L. ed.2d 493.

Consequently, in the light of the decisions of the United States Supreme Court, which we are obliged to follow in construing such Federal rights, the Illinois Appellate Court herein was limited to determining whether there was an evidentiary basis for the verdict, and, as set forth in our original opinion, it was error to reweigh the evidence and set aside the jury verdict. This conclusion is in accordance with the policy of the United States Supreme Court to prevent the erosion of rights conferred by the Federal Employers' Liability Act, particularly the right to jury trial, and to effect uniformity in the application of Federal rights. For, if the reviewing court could set aside the jury verdict by merely stating that it was against the manifest weight of the evidence, the right to jury trial could be set for naught.

The petition for rehearing reiterates defendant's contention that under section 75(2)(c) of the Civil Practice Act (Ill. Rev. Stat. 1955, chap. 110, par. 75(2)(c),) the remanding order should not be stricken by an Appellate Court where the prevailing party objects, and where the error can be obviated in a new trial. This contention has been amply considered and disposed of in our orginal opinion.

Nor do we perceive legal merit in defendant's latest argument that our interpretation of section 75(2)(c) of the Civil Practice Act, under which the Appellate Court is required to finalize a judgment where the moving party complies with the statute, would cause us to minimize errors and would bludgeon favorable decisions from us. Inasmuch as appeals from judgments finalized under section 75(2)(c) must be considered under the terms of the statute on the same basis as other appeals from final judgments, it is not clear how they would be entitled to, or could receive, special treatment as defendant suggests.

Moreover, defendant's interpretation of section 75(2)(c) would mean that the right of the losing party to finalize

the judgment in order to appeal would be subject to the whim of the prevailing party, and so long as the latter objected to striking the remanding order, the judgment could not be finalized and no appeal could be taken. We cannot accept this perversion of the terms of section 75(2)(c) and of the prevailing practice.

The other points submitted by the petition for rehearing do not warrant further comment, and present no grounds for modifying the conclusions we originally set forth.