Daniel B. McCorkel, Appellant, v. The Pennsylvania Railroad Company, a Corporation, Appellee.

Gen. No. 47,944.

First District, First Division.

October 2, 1961.

Rehearing denied October 20, 1961.

Harrison M. Fuerst, of Chicago, for appellant.

Robert H. Bierma, A. L. Foster, and Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Max E. Wildman and Fredrick W. Temple, of counsel) for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a Federal Employers' Liability case, in which plaintiff appeals from a judgment for defendant, entered on a not guilty verdict. The plaintiff, Daniel B. McCorkel, a locomotive engineer employed by defendant, seeks to recover for a severe hearing loss, which he claims was caused by the negligent operation of horns on defendant's diesel locomotives.

Plaintiff was born on September 2, 1892. He worked as a fireman and engineer for defendant from 1923

to November, 1955. Initially, he passed a physical examination, and subsequently passed periodical physical check-ups and examinations. It is undisputed that he has a hearing loss, and that defendant produced no witnesses to disprove plaintiff's testimony that on two occasions in 1955, while he was on duty, horns or whistles on locomotives of defendant, on adjoining tracks, were blown without prior notice to him. He made one trip in 1955, after the second occurrence, and has not worked since.

The principal contentions of plaintiff are that the verdict is against the manifest weight of the evidence; that he did not receive a fair trial; and that the court erred in the conduct of the trial and in the giving of an instruction.

 In FELA cases, the Appellate Court's function is exhausted when an evidentiary basis for the jury's verdict becomes apparent, and "only when there is a complete absence of probative facts to support the conclusion reached, does a reversible error appear." (Bowman v. Illinois Cent. R. Co. (1957), 11 Ill2d 186, 200, 201, 142 NE2d 104; Lavender v. Kurn (1946), 327 US 645.) This rule applies to both guilty and not guilty verdicts. (Perez v. Baltimore & Ohio R. Co. (1960), 24 Ill App2d 204, 209, 164 NE2d 209.) When there is an evidentiary basis for the jury's verdict, "the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." (Lavender v. Kurn, 327 US 645, 653.) Therefore, our examination of the evidence is limited to a determination of "whether there was an evidentiary basis for the jury's verdict." Bowman v. Illinois Cent. R. Co., 11 Ill2d 186, 202, 142 NE2d 104.

·Plaintiff testified that on September 16, 1955, while he was on duty in the cab of a locomotive, someone inside the cab of a diesel locomotive, about 8 to 10 feet away from plaintiff, pulled the horn wide open

196

and sounded two long blasts on the horn. The blasts were each of about 5 seconds duration and 2 or 3 seconds apart. He had a lot of pain in his head and his ears hurt. He reported the incident of September 16, 1955, on his regular periodical check-up on September 28, 1955. His ears were examined and his hearing was found poor. He was referred by defendant to Dr. Brice Fitzgerald, who treated him from September 28, 1955, until October 28, 1955. During the latter part of October he felt some improvement and lessening of pain.

On November 22, 1955, while sitting in the righthand side of the engine cab, with his head outside of the window, someone in a locomotive, which was stopped on an adjoining track about 4 feet from plaintiff, sounded 5 long blasts on the horn, each blast being 6 or 8 seconds duration and about 2 seconds apart. Plaintiff experienced severe and almost unbearable pain. He immediately reported this incident and was sent to a Dr. Stevens, who gave him a prescription for medicine, which he took. The next day dizziness set in, and after one more trip, he never worked again for the defendant or anyone else.

Plaintiff further testified that he never had any difficulty with his hearing prior to September 16, 1955; that in 1924 he had a slight burn, also malarial fever; that in 1945 he had pneumonia for six weeks; that from November 22, 1955, until the trial, his hearing had not improved, and pain and dizziness bothered him continually. He was taken out of railroad service by defendant's medical department and never received a return-to-duty card, nor was he offered a yard job. He denied telling Dr. Fitzgerald on September 28, 1955, that he had been gradually losing his hearing for 25 years.

Plaintiff also testified, "It was the custom and practice to make it known to anyone who was close

to you, that you were going to blow the horn, in order to give them a chance to protect themselves. Many times there were orders on the bulletin board with regard to blowing horns when people were in close proximity. . . . I have seen these orders posted in Logansport, Columbus and Chicago. They caution you about the excessive use of the whistle."

On cross-examination regarding standard railroad whistle or horn signals, plaintiff testified, "I have heard the five whistle blasts to call in a flagman many times, and I have known two engines to be sitting side by side on a track, but usually in that case an engineer will caution the other fellow if he thinks it could do any damage." Plaintiff identified his signature on a notarized renewal application for a driver's license in the State of Indiana, made in September, 1958, which shows his date of birth as September 2, 1897, and contains the following question and answer: "9. Are you hard of hearing? No." In connection with this document he stated, "In September of 1958, when I applied for a driver's license with the State of Indiana, I just showed the lady the other driver's license and she took it off of there."

The fireman who was on duty with plaintiff on both dates deposed that he was not present at the September 16, 1955, occurrence. He corroborated plaintiff's testimony as to what occurred on November 22, 1955. He stated, "It is unusual for one engine to stop beside another engine and sound a whistle like that when there is a crew on both engines. . . . It is in the book of rules and also it's been posted on the bulletin board at various times, that the unnecessary use of the horn is prohibited and a fellow is supposed to use a little common sense when somebody is around." He also stated that on November 22, 1955, "the sound of the whistle was in the usual manner to call in the flagman."

198

The fireman on the other locomotive involved in the November 22 occurrence deposed that he recalled the incident and stated, "I sounded the horn 2 shorts; and then after a period of time, I started to sound some long blasts of the whistle to recall the flagman. . . . As far as I know, my horn was working all right on that occasion and I do not recall having any difficulty with it. . . . At that particular time, we were headed west and calling the flagman from the east which would be 5 long blasts of the whistle. . . . The 2 short blasts were in answer to a signal to a switchtender. You generally railroad by the use of signals of some type. . . . On that particular type of horn, I expect it sounded just as it had on other occasions."

An expert witness for plaintiff testified that a diesel locomotive whistle is "one of the most powerful sound sources ever developed by man."

Plaintiff produced testimony from four physicians concerning examinations, consultations and treatments on various dates and occasions prior to and following September 16, 1955. Dr. H. M. Schultz, plaintiff's family physician, testified that in February, 1953, he treated plaintiff for pneumonia, and gave him penicillin; that in January and May, 1954, he treated plaintiff for colds and the medicines prescribed included omnadin, an antibiotic; that in January, 1955, he treated plaintiff for a sore throat and gave him penicillin and sulpha cold tablets; that from 1951 until January, 1955, plaintiff never complained to him about his hearing; and that in November, 1956, plaintiff informed him of his ear trouble, and he referred him to a "hearing man."

Dr. Maurice H. Cottle, an ear specialist for plaintiff, examined him and conducted ear tests in January and in June of 1956. Both examinations showed a very marked loss of hearing, "so severe that nothing can be done to remedy it. My opinion is that mechani-

cal help cannot help him enough to bring his hearing into a serviceable arrangement. My opinion based on those examinations is that his loss of hearing is permanent. . . . There is no difference between noise induced hearing loss and acoustical trauma. Dizziness is very frequently found with a hearing loss resulting from noise. A profound total hearing loss is usually found as a result of a hearing loss due to noise. . . . Because Mr. McCorkel told me about these noises in September and November of 1955, and because the ear drums appeared to be intact and I found nothing else to attribute the hearing loss to, I assumed that that was the cause of the hearing loss. Otologists see many patients with the same clinical picture of deafness and so on that Mr. McCorkel presented, who have never been near whistles and exposed to that noise, and there is no other obvious explanation. . . . Disease process can be a cause of hearing loss, also drugs and age."

Dr. George E. Shambaugh, an ear specialist for plaintiff, conducted ear tests in 1956 and 1957. The doctor found no essential pathology and the drum membranes of both ears were normal. The tests confirmed the fact that plaintiff's hearing loss was of the inner ear or nerve type. He stated, "We have every reason to think that Mr. McCorkel's hearing loss is permanent in view of the fact that his hearing level changed very little in the period of time that he was observed by myself and in the hearing clinic. If there was any change at all, it was a slight further loss of hearing. It is very unusual to see a loss as severe as this from noise, very unusual, but cases are seen occasionally where a loss as severe as this has been caused by noise. There is a possibility that the condition which I found on those dates might or could have been caused by loud noise or acoustical trauma. . . .

I couldn't tell from any examination that I conducted, how long the hearing loss had been present, nor could I tell what caused it. The only thing that I could tell from my examination was that he did have a hearing loss. . . . There are a variety of causes which can result in a profound nerve deafness. Deafness from drugs can do this. For example, large doses of quinine, streptomycin, dihydrostreptomycin. . . . high fever of any type, pneumonia, typhoid, scarlet fever, measles, influenza, are all rather common causes. Malaria probably is not, but the quinine given for malaria certainly can do it. I have never seen a nerve deafness as severe as this from an allergy. Streptomycin can cause it, and dihydrostreptomycin and neomycin are the commonest antibiotics to cause this. A condition of profound hearing loss such as that described can be due to acoustical trauma or loud noise without any external evidence of injury. . . . We think the intensity is more important than the frequency."

Dr. Guy A. Owsley, an ear specialist for plaintiff, conducted hearing tests in June, 1958. The ear drums were intact and normal. An audiometric examination showed a profound high tone loss in all frequencies. In his opinion the incidents of September 16, 1955, and November 22, 1955, "might or could have caused his problem." His diagnosis, "based on history, was that he had acoustic trauma producing perceptive deafness based on findings. My final diagnosis was irreversible perceptive hearing loss." On cross-examination he testified, "My diagnosis of acoustical trauma was based upon the history which he gave me and upon what he told me had happened. He did not give me the history of his general physical condition. Chronic upper respiratory infections, influenza and malaria are competent causes for deafness. Chronic respiratory infections generally speaking produce a

201

conductive loss rather than perceptive. Influenza might cause a perceptive loss, it is possible, virus infections generally and malaria could cause a loss mainly through the use of the treatment for the disease, which is quinine and could cause a perceptive loss if given over a long enough period of time. . . . I think a horn for the same period of time on 2 occasions as the drill press, would probably produce acoustic trauma more likely than the drill press . . . . In this instance, I was of the opinion that it probably caused his hearing loss. Mr. McCorkel indicated that he was 60 years of age and I received no other history from him."

Defendant limited its defense to the testimony of three medical witnesses. Dr. Stephens, an ear specialist, saw plaintiff on one occasion, November 22, 1955, and made a first aid examination. There was no evidence of any hemorrhage or rupture in the ears, and he conducted no hearing tests. He stated, "My presumptive diagnosis of Mr. McCorkel was traumatic auditory neuritis, I didn't do any tests." He further testified that hearing loss may result from advancing age and disease process from antibiotics, toxic poison or exposure to noise; that senile deafness can develop within the ear, and the causes of both traumatic and senile deafness would be difficult to differentiate; that "auditory impairment of any consequence should always have visible signs immediately after, such as ruptured drum, hemorrhage into the drum, blood behind the drum or swelling of the drum."

Dr. Meyer S. Fox, an ear specialist, testified as an expert witness on behalf of defendant. He testified in general and at length as to the make-up of a human ear and the mechanics of hearing and the effect of noise on hearing, including intensities and composition encountered in industrial situations and everyday life. Many years of exposure to many types of

202

noises will tend to encroach upon the speed zone. There is a big difference between explosions, blasts, and noise. Noise has two components; one is the frequency and the other is the amplitude. By intensity is meant what is called loudness. An explosion or blast has two components: one, a shock wave, and two, a sound wave. It is the shock pulse that does the damage. It may do physical damage to the ear itself, such as rupturing the ear drum. A diesel whistle does not produce an explosion. Influenza is one of a number of virus diseases, and that the virus can and does, in certain individuals, affect the inner ear in the auditory nerve, leaving that ear profoundly and, in some cases, totally deaf. It is the toxin of the virus, independent of any noise, that does the damage.

In response to a long and detailed hypothetical question, which was rephrased to meet objections, he gave an opinion that the hearing loss outlined could not have resulted from an exposure to whistles, as described. "The reason for my opinion is that the ear does not respond to intense noise in that fashion. You will not get a severe sudden hearing loss from noise. I distinguish noise from an explosion and you do not get some of the symptoms such as persistent pain, dizziness—they don't come from noise. Dizziness comes from a disturbance usually of the semi-circular canals in the ear."

Dr. Brice Fitzgerald, an ear specialist called on behalf of defendant, testified that plaintiff was referred to him by defendant's general examining railway physician for a hearing test on September 28, 1955. He stated, "Mr. McCorkel told me that he had had an injury to his ear from the noise about 12 days previous to the time of my test. I asked him if he had had any previous difficulty in hearing, and he said he had had a gradual loss in hearing for twenty-five years, which I made a record of and have here with me. The hand-

writing on exhibit 6 [marked for identification] is my own and was recorded on September 28, 1955. I specifically wrote 'gradual deafness, 25 years' on that date." The doctor made audiometric examinations on September 28, 1955, October 27 and December 29, and these examinations showed a decrease in hearing over the three month period.

Under cross-examination Dr. Fitzgerald testified that in January, 1956, plaintiff had dizziness, headaches and sensitivity to noise, which, in the doctor's opinion, might have disqualified him permanently from his previous duties; that the "injury" consisted of a deafness, partial and bi-lateral, of the nerve type; that following November 22, there was a dermatitis of the skin in plaintiff's ear canal. The doctor found a painful blister in the ear canal in his December examination and treated plaintiff for the blister. The card made out by him on September 28 also contains the notation in his handwriting: "says diesel blast"; also, "Says hearing is down from a Diesel blast Sept. 16, 1955."

█ After a careful examination of the evidence, we have come to the conclusion that there is an evidentiary basis in the record to support the jury's verdict. (Bowman v. Illinois Cent. R. Co., 11 Ill2d 186, 202, 142 NE2d 104.) We think the record contains a reasonable basis for the jury to decide that the horn or whistle blowing incidents were not negligent and routine railroad signals on standard equipment, or to decide that plaintiff's hearing loss was not caused by the horn blowing, or to decide both issues for defendant. "The jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." Lavender v. Kurn, 325 US 645, 653.

█ █ As to trial errors, plaintiff complains about the conduct of defendant's counsel during the trial and relates a number of instances to show that plain-

204

tiff was deliberately prejudiced by this conduct. Included are statements made in the presence of the jury, the interrogation of the plaintiff, the form of general and hypothetical questions and also statements made in the closing argument. It seems unnecessary to repeat that a trial should be conducted with professional dignity and without prejudicial conduct of counsel. We are not disposed to excuse such conduct because it occurred during the "heat" of the trial. However, the record shows that the trial judge promptly sustained objections made, and, where necessary, properly instructed the jury to disregard the incident then in dispute. In this case, we do not believe the questioned conduct affected the verdict. Some of the conduct is not to be commended, but the trial judge was diligent and effective in his efforts to see that both sides received a fair trial. The trial judge did not err in dismissing the charges made.

■ Plaintiff argues that the hypothetical question put to Dr. Fox, defendant's expert witness, was improper. As put in its final form, we believe it was proper. The record contains evidence tending to prove each of the facts therein assumed. (Botwinis v. Allgood (1903), 113 Ill App 188.) Plaintiff also complains that the court unduly restricted the re-cross-examination of this witness. The record indicates that the cross-examination and re-cross-examination of this witness was prolonged. Full latitude was allowed to ascertain the accuracy and extent of his knowledge of the causes of hearing losses encountered in industrial situations and in civil life. A broad range of inquiry was permitted. The court considered fully the proposed line of inquiry before sustaining the objection. We find no undue restriction of the cross-examination of Dr. Fox.

We find no error in the giving of the impeachment instruction. The record justified it. The form used

has been approved by the Illinois Supreme Court Committee on Jury Instructions. It was accompanied by plaintiff's instruction No. 3, which defines the issues and gave the jury a basis for determining what matters were material.

For an additional ground for a new trial, plaintiff asserts that there is newly discovered evidence which was not known or available while defendant's witness, Dr. Fitzgerald, was testifying, and which evidence, plaintiff argues, would have impeached the doctor's direct testimony and substantially destroyed him as a witness in this cause.

On cross-examination, the doctor was questioned as to whether he had "all of his office records with you." He replied, "Yes, I do. This is my office record." At that time, he produced his office record card, which contained the previously mentioned notation, "Gradual deafness, 25 years." On post-trial depositions ordered by the court on defendant's motion and made a part of plaintiff's motion for a new trial, it was developed that Dr. Fitzgerald had with him, while he was testifying for defendant at the trial, an envelope which was on a bench in the court room under his overcoat. This envelope contained two letters or copies, written by Dr. Fitzgerald, in which he purports to describe his findings on his examinations of plaintiff. The letters do not contain any reference to the gradual loss of hearing over 25 years, which he testified plaintiff had told him about, and which he noted on his office record card. These depositions were considered by the court before denying the motion for new trial.

We have considered these letters in the light of Dr. Fitzgerald's testimony that he had received from plaintiff, a history of a gradual loss of hearing. We are not persuaded that these letters tend to impeach or discredit Dr. Fitzgerald, nor do we believe that the newly found evidence furnishes any reasonable basis

for believing that a different result would be reached at a second trial.

We find no abuse of discretion in the trial court's refusal to permit the reading of the deposition of Dr. Amberg on rebuttal and the ruling that the deposition should have been read during the presentation of plaintiff's evidence in chief.

We have concluded, from an extended examination of this record considered in the light of plaintiff's contentions, that no reversible error is presented here. Therefore, for the reasons stated, the judgment is affirmed.

Affirmed.

BURMAN, J., concurs.

ENGLISH, J., took no part.