GERALD MEYER, Plaintiff-Appellee, *v.* PENN CENTRAL TRANSPORTATION COMPANY, Defendant-Appellant.

First District (5th Division)    No. 78-1337

Opinion filed October 19, 1979.

Mark C. Fedota, Michael L. McCluggage, and Michael R. Dockterman, of Chicago (Wildman, Harrold, Allen & Dixon, of counsel), for appellant.

Marshall I. Teichner, of Chicago (Philip J. Rock and Katie Newsham, both of Rock, Fusco & Heneghan, of counsel), for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff, Gerald Meyer, brought this action pursuant to the Federal Employers Liability Act (FELA) (45 U.S.C. §51 *et seq.* (1970)) against his employer, Penn Central. Following a jury trial, Meyer was awarded $125,000 in damages. The trial court granted Meyer's motion for a new

trial on the issue of damages. On appeal, defendant contends the trial court erred in granting plaintiff's motion for a new trial.

Plaintiff, a railroad brakeman, was injured during the coupling of a caboose to a train. At the time of the coupling, plaintiff was inside the caboose and was knocked about the caboose by the impact. The question of defendant's liability is not raised on appeal. The following evidence pertinent to the issue of damages was adduced at trial.

### For the plaintiff
#### William C. Norton

On May 11, 1973, he was the conductor of the train crew in which plaintiff was working. Before the coupling, he and Meyer were inside the caboose. When he noticed the train approaching, he told Meyer, "Hold on, we're going to get hit." He jumped off the caboose before the impact, but Meyer remained. The train was moving at approximately 15-20 miles per hour at impact. After the impact, he went inside the caboose and noticed the locker doors and windows had popped open. Meyer was lying on the floor and could not get up without help. Meyer said his legs were hurt. He fixed a bed for Meyer to rest on during the trip to their destination in Kankakee.

On cross-examination, he admitted that neither the train nor the caboose derailed after impact. He did not request a different caboose from the railroad for the trip to Kankakee.

#### Gerald Meyer, in his own behalf

He was thrown violently around the inside of the caboose at the moment of the coupling. Inside the caboose, seat cushions came loose and windows and locker doors came open. After the impact, he felt a sharp pain in his back. Upon arriving in Kankakee, he was taken to Riverside Hospital where he remained for 21 days. While in the hospital, he received therapy and medication for the pain and was placed in traction. He continued to experience pain in his back, left leg, and head at the time of his discharge. For the next two months, he received physical therapy as an out-patient. In November 1973, he was hospitalized because of his continuing pain. He had complete bed rest, received medication for the pain and underwent therapy. He returned to the hospital for a third time in May 1974, and for 21 days received medical treatment similar to the previous two occasions. In March 1975, he was hospitalized for a fourth time. He received medication and was given cortisone injections in the lower back. At the end of this hospital stay, he felt no improvement. At the time of trial, his condition remained the same as it was in August 1975. No doctor had ever recommended surgery to him.

From January 1, 1973, to May 11, 1973, the day of the accident, he earned approximately $6,300. Since the accident, he has been physically

unable to return to work. He cannot lift more than five pounds, walk or sit for any length of time, or stoop.

On cross-examination, he admitted that after the impact neither the caboose nor the train derailed. Since the accident, he has driven his car occasionally and has worked as a weigh scale operator.

*Dr. Anthony L. Brown*

As a practicing orthopedic surgeon, he examined the plaintiff on April 15, 1976. At that time, Meyer was in no acute distress and had a full range of motion in his shoulders. He did not find any abnormalities in the muscle groups of Meyer's legs. There was a moderate restriction of motion in the cervical area and the lumbar spine. He noted a slight spasm or muscle tightness in the lumbar spine. He concluded that Meyer had a chronic cervical and low back derangement. Chronic means a long-standing condition which is not in a state of change. He recommended that Meyer refrain from walking or sitting for over a half hour and not lift objects weighing more than five pounds.

*Dr. Allan Hirschtick*

He is an orthopedic surgeon. Following his examination of Meyer on October 30, 1973, he had Meyer hospitalized because of Meyer's complaints of headaches and pain in the left leg, back, and neck. He noted some spasticity of the muscles in the cervical spine and moderate restriction of motion of the neck and head. He also found greater restriction of motion in the lower back.

He had Meyer hospitalized again in May 1974. During this hospitalization, a myelogram was performed and he diagnosed a herniated disc at the level of the fourth or fifth lumbar vertebrae on the left side. He gave Meyer sternoid injections to relieve the pain in his back.

In March 1975, Meyer was admitted to the hospital for observation and therapy. Meyer received cortisone injections into the spinal cord which resulted in considerable improvement. On May 4, 1975, he found Meyer still suffered pain in his back and left leg, but there was also improvement. He next examined Meyer on June 20, 1977. Based on all of these examinations, he concluded that Meyer's condition was caused by the accident on May 11, 1973. He further concluded that Meyer's injury is permanent and that Meyer is unable to return to work with the railroad. Although surgery should give Meyer considerable relief from the pain, it would not return his back to normal or allow him to return to work.

On cross-examination, he testified that surgery produces good results in 75 to 80 percent of cases similar to Meyer's. In June 1977, he recommended that Meyer undergo surgery to obtain relief from the pain.

*Dr. Jonas V. Mileras*

He is a neurologist. When he examined Meyer in August 1975, he

found a numbness in his left leg and stiffness in his back. He believed Meyer was suffering from a dysfunctionable back as a result of the accident on May 11, 1973.

An electromyographic examination of Meyer's back conducted shortly after the accident showed normal findings. However, an electromyogram conducted in 1977 showed abnormal findings. From the latter electromyogram, he concluded Meyer had a degenerating disc problem in his lower back. He explained that the normal electromyogram in 1973 was not unususal because this type of ailment does not reveal itself immediately. While recovery may occur in the next 10 or 15 years, Meyer's condition should be considered permanent. Meyer cannot perform work requiring excessive stooping, walking, bending, or pulling. He recommended surgery if the patient feels very uncomfortable.

On cross-examination, he stated that trauma is not necessarily the only cause of disc degeneration. A herniated disc need not be the result of a significant trauma, but may be the result of daily physical labor. The chances for improvement by surgery are not overwhelming.

*Dennis Petersen*

He is a rehabilitation counsellor for the State of Illinois Division of Vocational Rehabilitation. Based on his interview with Meyer on July 27, 1976, and a medical evaluation by Dr. Brown, he concluded that Meyer's condition was too severe for his agency to be of any assistance.

On cross-examination, he explained that he had made repeated unsuccessful attempts to interview Meyer from January 1975 to July 1976.

*Raymond C. Norton*

He is chairman of the local union in which Meyer was a member. The average annual wage for a brakeman in Meyer's local was between $20,000 and $25,000. This figure would vary depending upon the individual's willingness to work.

On cross-examination, he explained that a worker had the option of declining a particular work assignment.

*Arthur G. Dobbelaere*

He is an assistant professor of Economics and Industrial Relations at Loyola University. His testimony examined the present cash value of Meyer's lost earnings over the course of his working life. Meyer would have earned $17,459.52 during 1973 based on his earnings of $6,379.44 from January 1 to May 11, 1973. Meyer had a projected working life of an additional 25 years from the time of the accident and the present cash value of the lost earnings during that time span was $563,825. If Meyer worked until the age of 70, the present cash value of these lost earnings would be $705,532.

On cross-examination, he testified that any wages Meyer might earn

during these years was not considered in his projections. Meyer's earnings of $12,511.60 for 1972 and $8,454.98 for 1971 were considered only indirectly in his calculations.

### For the defendant
#### Wilson W. Frisch

He was the conductor on the train which coupled with the caboose in which Meyer was injured. The train was approaching the caboose at approximately three to four miles per hour and the engineer was applying the brakes. At impact, he did not lose his balance or fall. After the coupling, he went inside the caboose and saw a man walking about. He noticed the locker doors were opened and seat cushions were on the floor.

#### Dr. Brian H. Huncke, by evidence deposition

He is an orthopedic surgeon. On November 4, 1975, he examined Meyer at the request of Dr. Mileras. His examination revealed a muscle tightness or spasm in the lower back and some subjective tenderness in the midline of the low back. Meyer told him of continuing pain and stiffness in his lower back, but that the pain in his upper back had subsided a fair amount. An electromyogram taken six days after the accident revealed no evidence of muscle or nerve root damage. Standard X rays and myelographic X rays of Meyer showed no pathology. He diagnosed Meyer as having sustained a lumbosacral strain during the accident. However, there was no pathology or organic source for Meyer's complaints of pain. Accordingly, he could find no reason to prevent Meyer from returning to full and unrestricted work.

He believed Meyer suffered from "operant pain." The concept of "operant pain" defines a chronic pain problem which is independent of any identifiable organic source.

On cross-examination, he admitted the normal myelogram did not totally exclude the possibility of a herniated disc. In addition, he explained that a person suffering from "operant pain" does, in fact, experience pain and it can constitute a permanent disability.

### Opinion

Penn Central contends that the trial court erroneously applied Illinois law in determining whether to grant a new trial on the issue of damages. According to Penn Central, the proper standard is determined by Federal law, and under the Federal standard, the jury's verdict should not have been disturbed. Meyer, on the other hand, argues that the Illinois standard is applicable to FELA cases and that the trial court properly granted his motion for a new trial.

■■ Review by State courts of jury verdicts in FELA cases is to be made in accordance with Federal law. (*Bowman v. Illinois Central R.R. Co.*

(1957), 11 Ill. 2d 186, 142 N.E.2d 104, *cert. denied* (1957), 355 U.S. 837, 2 L. Ed. 2d 49, 78 S. Ct. 63; accord, *Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 368 N.E.2d 88; *Skinner v. Baker* (1978), 67 Ill. App. 3d 773, 384 N.E.2d 1360; *Woodruff v. Pennsylvania R.R. Co.* (1964), 52 Ill. App. 2d 341, 202 N.E.2d 113; *McCorkel v. Pennsylvania R.R. Co.* (1961), 32 Ill. App. 2d 193, 177 N.E.2d 369.) Under Federal law in FELA cases, a jury verdict will be set aside "[o]nly when there is a complete absence of probative facts to support the conclusion reached * * *." (*Lavender v. Kurn* (1946), 327 U.S. 645, 653, 90 L. Ed. 916, 923, 66 S. Ct. 740, 744.) We acknowledge the Supreme Court's admonition that in FELA cases "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." (*Tennant v. Peoria & Pekin Union Ry. Co.* (1944), 321 U.S. 29, 35, 88 L. Ed. 520, 525, 64 S. Ct. 409, 412.) Given these guidelines, our duty is not to decide this case anew, but rather to determine whether there is sufficient evidence to support the jury's verdict. If there was sufficient evidence, then the trial court erred in granting a new trial.

We believe evidence pertaining to the magnitude of the impact, the nature and extent of Meyer's injury, the extent of his pain and suffering, and his ability to work forms an adequate foundation for the jury's verdict. First, the jury could have reasonably inferred that the force of the impact could not have resulted in the extensive injury allegedly sustained by Meyer. William Frisch testified that the train was travelling at three to four miles per hour and the brakes were being applied at the time of impact. Even though Frisch was not holding on to anything, he did not fall as a result of the impact. Additionally neither the caboose nor the train derailed after the impact. From this evidence, the jury could have readily inferred that force of the impact was insufficient to toss Meyer about the caboose.

Second, sufficient evidence was presented to allow the jury to infer that Meyer's injury was not permanent, but was either partially disabling or temporary in nature. Dr. Huncke testified there was no pathological or organic damage suffered by Meyer. According to Dr. Huncke, Meyer could have returned to full and unlimited work. Although Dr. Mileras characterized Meyer's injury as permanent, he added that recovery could occur. Improvement in Meyer's condition was noted by Dr. Hirschtick in May 1975. Under the principles of judicial review of jury verdicts in FELA cases, there was sufficient evidence for the jury to conclude either that Meyer's injury was temporary in nature or at the most only partially disabling.

Third, the extent of Meyer's pain and suffering was in question. We note that the issue of pain and suffering often turns upon whether the jury

believes the plaintiff. Although objective evidence may corroborate plaintiff's subjective complaints of pain and an inability to function as in the past, the end result will largely depend upon the jury's decision on whether to believe the plaintiff. (See *Porterfield v. Burlington Northern Inc.* (9th Cir. 1976), 534 F.2d 142.) Based on their assessment of Meyer's credibility, the jury was free to accept or reject his testimony. Along this same line, Dr. Hirschtick recommended to Meyer that he undergo surgery to obtain relief from the pain. Dr. Hirschtick stated that 75 to 80 percent of the time surgery produces good results. Meyer's refusal to submit to surgery allowed the jury to infer that his pain was not as severe as he claimed. Finally, we refer to Dr. Huncke's conclusion that no pathology or organic source for Meyer's complaint of pain exists. We believe a jury could have inferred that Meyer's complaints of pain were either notably exaggerated or simply fictional.

Fourth, plaintiff's contention that he was permanently disabled and could not hold any job was in dispute. Again, we refer to Dr. Huncke's conclusion that Meyer could return to full and unlimited work. Also, there is Meyer's own testimony that since the accident he has worked as a weigh scale operator. Meyer further testified that he has driven his car occasionally since the accident. This evidence sufficiently supports an inference that Meyer was not permanently disabled and could return to some form of work.

We therefore conclude there was a sufficient evidentiary basis to permit the jury to set plaintiff's damages at $125,000. Accordingly, the order of the circuit court of Cook County granting a new trial on the issue of damages is reversed and the jury's verdict is re-instated as the judgment in this case.

Reversed.

SULLIVAN, P. J., and WILSON, J., concur.