CLYDE GREENFIELD, Plaintiff-Appellant, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.

Fifth District   No. 5—85—0262

Opinion filed November 18, 1986.

332

Maurice E. Bone and Michael J. Reagan, both of Kassly, Bone, Becker, Dix & Tillery, P.C., of Belleville, for appellant.

Walker & Williams, P.C., of Belleville (David B. Stutsman, Anthony L. Martin, and Lisa M. Pennock, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Clyde Greenfield, filed a multicount complaint in the circuit court of St. Clair County against defendant, Consolidated Rail Corporation, for damages resulting from plaintiff's heart attack, which he alleged was caused by his employment with defendant. Judgment was entered upon a jury verdict for defendant. Plaintiff appeals contending (1) the verdict was against the manifest weight of the evidence, (2) the court erred in dismissing one of his counts, (3) the jury was improperly instructed on causation, negligence, and preexisting conditions, and (4) counsel for defendant violated an *in limine* order which prohibited reference to collateral sources of compensation. We affirm.

Plaintiff had been employed by Pennsylvania Truck Lines (PTL), a wholly owned subsidiary of Consolidated Rail Corporation (Conrail), at the Roselake railyards in St. Clair County since 1975 or 1976. He was working as a groundman in the railyards on Saturday, September 19, 1981, helping to load trailers onto railroad flatcars. This is commonly known as a piggyback operation. Plaintiff's job on that day was to secure the trailers to the flatcars after they were loaded and to lower and raise bridgeplates between the flatcars. Bridgeplates are steel planks which are placed between the flatcars, making a continuous path between them and bridging the gap over the space where they are coupled. Several flatcars are loaded together, so it is necessary for the vehicle loading them to drive from the lead flatcar to the last

car, deposit a trailer, drive back across all the cars, get another trailer, and drive across all the cars again to place the trailer at the next available space. After the flatcars are loaded with trailers, the bridgeplates, which are permanently attached to the flatcars, are raised.

Plaintiff's work required him to climb on and off the flatcars as he secured the trailers and lowered and raised bridgeplates. In the course of his work that day, he started feeling "a little woozy." After this onset of wooziness, plaintiff came to a bridgeplate which needed to be raised but was stuck. Plaintiff had encountered the same problem previously in his experience loading trailers. Doing what had worked for him before when confronted with this problem, he picked up a railroad car brake shoe which was on the ground nearby, positioned himself under the bridgeplate, and struck the bridgeplate with the shoe six or eight times. The evidence showed this bridgeplate weighed approximately 160 pounds and the brake shoe weighed 22 pounds. Plaintiff testified that while banging on the bridgeplate, "I really got sick and I vomited." He backed away from his work, took a deep breath, and crawled back under the bridgeplate and resumed hitting it with the brake shoe. He was eventually able to dislodge it so it could be raised. After this episode, he resumed his work despite continuing to feel sick. He later stopped to have lunch and, after eating, vomited again, but returned to work. Plaintiff testified that he thought he was suffering from a chest cold or the flu. He completed his normal workday, then went home. He continued feeling sick and vomited again that evening and the next morning. In the morning he and his wife were driving to church when his wife decided he was so ill he should be taken to a hospital emergency room.

It was determined that plaintiff had a heart attack. Medical experts testified that he technically died after arriving at the hospital, but was revived. Plaintiff was released from the hospital after 21 days, but has not been able to return to work. Plaintiff must restrict his activity considerably.

Certain medical evidence at trial was undisputed. There was no dispute that plaintiff had an advanced case of atherosclerosis, or coronary artery disease, prior to his heart attack. This is a progressive disease which causes arteries to become blocked, restricting the flow of blood. Plaintiff's disease worsened after the heart attack to the point that, in 1983, bypass surgery was performed. It was also undisputed that hypertension, diabetes and smoking are risk factors for atherosclerosis, and that plaintiff suffered from hypertension and diabetes prior to his heart attack and that he had smoked regularly up

until 1976. Plaintiff had also had a kidney removed in 1976. There was also undisputed medical evidence that nausea and vomiting often occur at the onset of a heart attack.

Several medical experts testified regarding the cause of plaintiff's heart attack. Dr. John Codd, a cardiovascular surgeon, testified for plaintiff by way of an evidence deposition. Dr. Codd performed bypass surgery on plaintiff in September of 1983, two years after the heart attack. He testified that any form of stress or exercise can precipitate heart attacks, particularly when a person has underlying coronary artery disease, as plaintiff does. He added that it is not always physical activity that precipitates the heart attack, but that heart attacks can also occur during sleep, although the risk is greater during stress. Dr. Codd made a statement that plaintiff's banging on a bridgeplate precipitated his heart attack. However, later in his testimony he stated that "the exact precipitating event that occurred in my mind is more than likely a combination of things." When asked if "what it boils down to is with as far as the precipitating event occurs is just whatever the person was doing before he had the heart attack, assuming he was doing something, that would be the precipitating event of the heart attack," Dr. Codd answered, "Correct." Dr. Codd testified that because plaintiff was known to have risk factors associated with heart attacks, a screening test should have been performed to determine his capabilities for doing strenuous work.

Dr. Edward Massie, a cardiologist, examined plaintiff after his heart attack. He testified that he conducted an electrocardiogram on plaintiff which confirmed he had suffered a heart attack. To be more specific, Dr. Massie described plaintiff's attack as an anterior lateral myocardial infarction. He explained that part of plaintiff's heart muscle had died. Plaintiff had a "fair amount" of atherosclerosis, or coronary artery disease, at the time he suffered his heart attack, according to Dr. Massie. It was Dr. Massie's opinion that plaintiff's heart attack actually began on September 19 and continued into the next day. He testified that plaintiff's banging on the bridgeplate had a specific connection with the development of the heart attack and stated this banging was "the incriminating action" which gave plaintiff has primary trouble, and that it helped precipitate the heart attack. Dr. Massie stated that the word "precipitate" means "cause." He also testified that the strenuous nature of plaintiff's work over many years can advance atherosclerosis and that it is probable that had a treadmill test been done sometime prior to the heart attack plaintiff's problem would have been discovered.

Dr. Duk C. Kim testified on behalf of defendant by way of an evi-

dence deposition. He had treated plaintiff for diabetes and hypertension since 1976. In September of 1980, plaintiff underwent an electrocardiogram which showed no irregularity, although Dr. Kim stated such a test does not always show when coronary artery disease is present. Dr. Kim testified that he believed plaintiff's condition had progressed gradually up until the heart attack. The doctor stated that the stress and physical exertion encountered by plaintiff at his job could have accelerated his heart disease and that the type of work done by plaintiff is the type of work which can precipitate a heart attack. However, according to Dr. Kim, a precipitating factor is not the same as a cause. It was his opinion the cause of plaintiff's heart attack was an advanced stage of atherosclerosis. He testified there is no way to completely prevent heart attacks and that they can occur during sleep. Furthermore, Dr. Kim testified that he would not conduct a stress test on a patient if the patient has no symptoms associated with atherosclerosis and added that plaintiff showed no signs of such symptoms.

Dr. Robert Lewis Litchfield, a cardiologist and osteopathic physician, testified by way of an evidence deposition for defendant that coronary artery disease is a progressive disease and that the more progressed the disease is, the more likely the person is to have a heart attack. He confirmed that plaintiff had significant coronary artery disease at the time of his heart attack and that this is what caused plaintiff to suffer the attack. It was his opinion plaintiff's heart attack occurred shortly before he was brought to the hospital. Dr. Litchfield testified that anything plaintiff might have been doing at the time of the attack could be considered a precipitating factor and that heart attacks can occur while walking, eating, or sleeping. He testified that heart attacks can many times be the natural result of atherosclerosis. The doctor stated he was not trying to say plaintiff's employment played no part in his heart attack and that the banging on the bridgeplate could be considered the precipitating event. However, he added that a precipitating event is merely a circumstance in time. Dr. Litchfield found no reason for a stress test to have been conducted on plaintiff prior to his heart attack because plaintiff showed no symptoms associated with an advanced stage of atherosclerosis. He also stated that considering all that was known about plaintiff's physical condition prior to the heart attack, he would have authorized him to work as a groundman.

There was also testimony from several employees of both Conrail and PTL. Testifying on behalf of plaintiff, they described the work which plaintiff performed in the railyard. Several of them testified

it was common for bridgeplates to become stuck and that it was common practice to use a brake shoe to knock them loose. They testified that the cause of the bridgeplates becoming jammed is a failure of the airbrakes or handbrakes on the flatcars. The workers stated that when the brakes fail, the cars roll together, jamming the bridgeplates in between. Several of these employees also testified that the job of freeing the bridgeplates would be much easier if catwalks were provided. Catwalks are steel walkways running parallel to the tracks at a height level with the beds of the flatcars. Regarding the nature of their employment, several of the PTL workers testified they often took orders from Conrail employees in the course of their work.

Plaintiff presented several theories of liability to the jury: (1) the Federal Employers' Liability Act (45 U.S.C.A. sec. 51 *et seq.* (West 1972)) (hereinafter FELA), (2) the Federal Safety Appliance Act (45 U.S.C.A. sec. 1 *et seq.* (West 1972)), and (3) common law premises liability. Plaintiff attempted to present a fourth theory of liability under a separate count, but this count was dismissed prior to trial. The jury returned a general verdict in favor of defendant and judgment was entered thereon.

■■■■ Plaintiff first contends the verdict was against the manifest weight of the evidence. "A verdict is against 'the manifest weight of the evidence' only when an opposite conclusion is clearly apparent or when the finding of the jury appears arbitrary and unsubstantiated by the evidence. [Citation.] A reviewing court will not overturn a jury's verdict unless, considering all evidence in the light most favorable to the party who prevailed at trial, the jury's conclusion is palpably erroneous and wholly unwarranted." (*Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389.) Under Federal law in FELA cases, a jury verdict will be set aside only when there is a complete absence of probative facts to support the conclusion reached. (*Meyer v. Penn Central Transportation Co.* (1979), 78 Ill. App. 3d 110, 115, 397 N.E.2d 60, 63.) We find plaintiff has not met these stringent standards for overturning the jury's verdict for defendant.

Plaintiff had two general theories of defendant's liability at trial. First, he attempted to show defendant caused his heart attack by failing to provide him with a safe place to work. While the medical experts agreed that plaintiff's heart attack could be attributed generally to his atherosclerosis, which was present before the heart attack, plaintiff argues that the evidence shows the banging on the bridgeplate was also a cause, working in combination with the preexisting condition. However, plaintiff testified he was feeling woozy prior to the banging on the bridgeplate. There was medical evidence that nau-

sea is one of the symptoms of the onset of a heart attack. The jury could reasonably find plaintiff's heart attack had begun prior to the banging on the bridgeplate. Even if the jury found the banging on the bridgeplate precipitated the heart attack, Drs. Litchfield and Codd testified that a precipitating factor is simply anything the person is doing at the time of the onset of the heart attack. Dr. Kim testified that to precipitate does not mean to cause. The medical experts agreed that coronary artery disease is a progressive disease, and Dr. Litchfield stated that many times a heart attack is the natural result of atherosclerosis. Thus, there was sufficient evidence to support a finding that plaintiff's heart attack began prior to the banging on the bridgeplate or a finding that, even if the heart attack began during the banging on the bridgeplate, this activity did not cause the heart attack. The experts testified that a heart attack can occur during any type of activity, including during sleep. The jury could have believed plaintiff would have had his heart attack on September 19, 1981, regardless of what he had been doing.

Plaintiff also attempted to show his employment prior to September 19, 1981, aggravated his atherosclerosis in that his work was made overly strenuous due to defendant's negligence or statutory violations. While there was expert medical testimony that the type of work performed by plaintiff *can* aggravate a condition of atherosclerosis, the jury was free to reject this testimony and rely upon the evidence which showed atherosclerosis is a naturally progressive disease.

Plaintiff's other general theory of recovery is that defendant was negligent in allowing him to work as a groundman when it knew or should have known he was physically unfit for the work. Plaintiff testified that he had told the "company doctor" that he had hypertension and diabetes, known risk factors for atherosclerosis. However, defendant's experts testified that plaintiff had shown no symptoms of coronary artery disease prior to his heart attack. These experts stated that they would not perform stress tests, which help to discover coronary artery disease, when a patient has shown no symptoms of the disease. Plaintiff had been assigned this type of work for many years and had shown no signs of being unable to perform his job. Dr. Litchfield testified that he would have authorized plaintiff to work as a groundman prior to his heart attack. While it is true plaintiff had several risk factors associated with atherosclerosis, these risk factors had been present for several years without interfering with plaintiff's employment. We find there was sufficient evidence upon which the jury could rely to find defendant was not negligent in allowing plaintiff to work as a groundman.

■ Having found support for the jury's verdict on these issues, we need not address the evidence on the other elements of plaintiff's various counts. We cannot say the jury's verdict is palpably erroneous or wholly unwarranted (see *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389), or that there is a complete absence of probative facts to support the verdict (see *Meyer v. Penn Central Transportation Co.* (1979), 78 Ill. App. 3d 110, 115, 397 N.E.2d 60, 63).

■ Plaintiff next contends the court erred in dismissing one of the counts of his complaint prior to trial. The dismissed count relied upon the Montana Supreme Court decision in *Reynolds v. Burlington Northern, Inc.* (1980), ____ Mont. ____, 621 P.2d 1028, to support a cause of action. Plaintiff relies upon *Reynolds* for the proposition that where a person is employed by a company which is a wholly owned subsidiary of a parent company, and where the person is engaged in duties that are closely connected to the business of the parent company, both companies have a duty to provide that person with a safe place to work. Citing *Reynolds*, plaintiff claims that while he was technically an employee of PTL, he was essentially also an employee of Conrail because Pennsylvania Truck Lines is a wholly owned subsidiary of the parent company and he was a servant of PTL, and because his work was under the control of the railroad. Consequently, he argues that Conrail had a duty to provide him with a safe place to work. In his brief, plaintiff states that this count "essentially is an alternative method of attempting to impose common-law negligence liability on the defendant by alleging its failure to provide the plaintiff with a safe place to work."

We find the dismissal of plaintiff's count based upon *Reynolds*, if error, was harmless because the theory of liability alleged in the dismissed count was presented to the jury under other counts. It has been held that "[w]here a party's pleading is struck, there is no prejudice to that party where evidence is taken and a finding is made on the same matters alleged in the pleading." *Hoffman v. Marcus Steel Co.* (1975), 33 Ill. App. 3d 1039, 1044, 339 N.E.2d 539, 543.

The theory of recovery in plaintiff's *Reynolds* count was essentially the same as that in plaintiff's FELA count. Under the FELA count, plaintiff attempted to show Conrail had the right to control him in the performance of his job to the extent that he should be considered a railroad employee for FELA purposes. (See *Kottmeyer v. Consolidated Rail Corp.* (1981), 98 Ill. App. 3d 365, 424 N.E.2d 345.) Thus, the theory that plaintiff did the work of a railroad employee and was subject to the control of the railroad was presented to the

jury. The jury found in favor of defendant on the FELA count, and we cannot see how the jury could have simultaneously found in favor of plaintiff on the *Reynolds* count without the verdict being inconsistent. Moreover, the theory that defendant had a duty to provide plaintiff with a safe place to work was presented to the jury not only under the FELA count, but also under the common law premises-liability count. Under premises liability, plaintiff relied simply on defendant's ownership of the premises and equipment to argue that defendant owed him a duty to provide a safe place to work. Plaintiff's instructions to the jury on the premises-liability count did not require a showing that plaintiff was an employee of Conrail. Thus, all of plaintiff's theories of recovery were presented to the jury, and we find no prejudice in dismissal of the *Reynolds* count.

■ Plaintiff also argues the jury was improperly instructed, and he makes three specific allegations of error. In reviewing all of these allegations, we apply the rule that "[t]he criterion for determining the adequacy of jury instructions is whether, taken as a whole and in series, they fairly, fully, and comprehensively apprise the jury as to applicable legal principles." (*Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 317, 487 N.E.2d 436, 438. See also *Denniston v. Burlington Northern, Inc.* (8th Cir. 1984), 726 F.2d 391, 393.) First, plaintiff claims the court erred in refusing to give the jury certain tendered instructions defining causation under the FELA. One of these tendered instructions stated that injury or damage is said to be caused by an act or failure to act when the act or omission "played any part, no matter how small, in bringing about or actually causing the injury or damage," while another of these tendered instructions stated defendant caused the injury if "any negligence on the part of the railroad *** plays any part, even the slightest, in producing any injury to plaintiff." We find no prejudice in the court's refusal to give these instructions for the reason that these definitions were included in other instructions which were given to the jury. Plaintiff's instruction No. 15, which is Illinois Pattern Jury Instruction, Civil, No. 160.02 (2d ed. 1971) (hereinafter cited as IPI Civil 2d), stated that the railroad shall be liable to the injured employee when "injury results in whole or in part from the negligence of any of the officers, agents or other employees of the railroad." Plaintiff's instruction No. 20 stated that plaintiff has the burden of proving "that the injury to the plaintiff results from any negligence on the part of the defendant which plays any part, even the slightest, in producing any injury to the plaintiff." Thus, plaintiff was able to present his definitions of causation to the jury, and there was no error in refusing to give the jury

further definitional instructions which would have been cumulative.

■ Plaintiff also claims the court erred in failing to give the jury his instruction No. 17, which stated: "It was the duty of the defendant, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff. That means it was the duty of the defendant to be free from negligence." He claims this instruction would have highlighted to the jury what he calls the "special duty" of the railroad to be free from negligence. Defendant argues that this instruction would have been repetitious. We agree. The court gave the jury IPI Civil 2d No. 160.08, which states: "It is the duty of the railroad to use ordinary care to provide its employee with a reasonably safe place in which to do his work." In addition, the jury was given plaintiff's instruction No. 18, which is IPI Civil 2d No. 120.06, which states: "The owner of the property, the defendant, owed the plaintiff the duty to exercise ordinary care to keep the property reasonably safe for use by the plaintiff for his safety." Other instructions regarding defendant's duty were also given. We find the jury was properly instructed on this issue and no error arose.

■ Another instructional error alleged by plaintiff related to the issue of a preexisting condition. Plaintiff complains of this instruction which was given to the jury:

"There is evidence that the plaintiff had atherosclerosis prior to his accident complained of here and for which defendant is not liable or responsible. If you find for plaintiff, then at arriving at the amount of your verdict, you should not consider any pecuniary loss caused by the atherosclerosis which would have resulted independently of the accident. You should not consider any medical or hospital expenses incurred by reasons of the atherosclerosis which would have occurred independently of the accident. If you should find that all damages which plaintiff claims to have sustained from and after September 19, 1981, are solely attributable to the progression of the atherosclerosis, you must return a verdict in favor of defendant."

Plaintiff claims this instruction advised the jury that defendant is not liable for any part of plaintiff's preexisting condition as a matter of law.

The complained-of instruction here was given to the jury along with damage instructions. The jury found the defendant not liable, and we do not believe any error in this instruction was so pervasive or prejudicial as to create a likelihood that it may have affected the jury's decision on the issue of liability. (See *Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 96, 476 N.E.2d 1378, 1383.) Furthermore, plain-

tiff's theory that defendant was at last partially responsible for plaintiff's preexisting condition of atherosclerosis was presented to the jury in the instructions regarding liability. The instructions, taken as a whole and in series, fully apprised the jury as to the applicable legal principles. (See *Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 317, 487 N.E.2d 436, 438; *Denniston v. Burlington Northern, Inc.* (8th Cir. 1984), 726 F.2d 391, 393.) We find no reversible error in the giving of this instruction.

■ Plaintiff lastly claims error in the numerous references by defendant's counsel to the fact plaintiff and other employees of PTL had all the "benefits" of Teamsters. Prior to trial, the court granted defendant's motion *in limine* regarding collateral benefits. The *in limine* order prevented defendant from referring to workers' compensation, Social Security disability payments, and insurance generally. The order did not refer specifically to Teamster benefits. During cross-examination of plaintiff and several of plaintiff's witnesses who were employed by PTL, defendant's counsel asked them whether, as members of the Teamsters' union, they were afforded all of the rights and benefits of Teamsters. In closing argument, defendant's counsel stated: "Now, if you want to grant Mr. Greenfield the railroad workers benefits in addition to [T]eamster benefits, that's within your discretion. You can do that if you want to. I don't know why he should have, personally, I don't know why he should be treated any different from any other [T]eamster, but that's within your discretion if you want to do that." Plaintiff contended these references to Teamster benefits were calculated to lead the jury to believe plaintiff had collected collateral benefits to compensate him for his injuries.

We find no reversible error in the complained-of statements. These references to Teamster benefits did not violate the specific prohibitions of the *in limine* order. Defendant's counsel did not refer to any specific compensation which might have been available to plaintiff from the Teamsters' union due to his heart attack. In referring to benefits, counsel was distinguishing the right to a cause of action available to a railroad worker under the FELA from the right to a cause of action available to workers not covered by the FELA. As we have discussed, one of plaintiff's theories at trial was that he was, in effect, an employee of the railroad and thus able to recover under the FELA. Defendant, in an effort to show plaintiff was not an employee of the railroad but rather a Teamster working for PTL, a trucking company, questioned plaintiff and other witnesses who are employed by PTL regarding their union affiliation. We thus find no reversible error in the references to Teamster benefits.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and JONES, JJ., concur.