CHARLES E. FAIRCLOTH, Plaintiff-Appellant, *v.* NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellee.

First District (4th Division)    No. 79-2391

Opinion filed October 23, 1980.—Rehearing denied November 20, 1980.

John J. Naughton, of Chicago, for appellant.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago (Tobin M. Richter, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Charles E. Faircloth, filed a two-count complaint against the defendant, Norfolk & Western Railway Company (Norfolk), under the Federal Employers' Liability Act (45 U.S.C. §51 *et seq.* (1976)). He sought to recover for knee injuries allegedly resulting from two accidents which occurred while he was working for Norfolk. The jury found for the defendant on each accident. Faircloth appeals from the judgment entered on the verdicts and seeks a new trial on the ground that the verdicts were contrary to the manifest weight of the evidence. He also appeals from the denial of his post-trial motion for a new trial on the grounds that the court abused its discretion or refused to exercise its discretion.

Faircloth presented two occurrence witnesses on each accident and submitted evidence as to damages. Norfolk denied liability but presented no evidence. Due to our disposition, we find it unnecessary to relate the evidence concerning damages.

The first accident occurred on January 2, 1974, at Norfolk's Front Street yard in Ohio. Faircloth and his supervisor at the time of the accident testified concerning this accident.

Conductor Charles Fuller testified that on January 2, 1974, he was supervising the crew to which Faircloth was assigned. Faircloth reported

to work on Fuller's crew about midway through the shift to replace a crew member who had left the job early due to illness.

Fuller instructed Faircloth that the crew was going to attempt a "three car kick." That is, three cars were to be separated from a 15-car train and allowed to roll onto another track. Cars are detached from the rest of the train by lifting a cutting lever which is located between every two cars.

Fuller started the movement after Faircloth stated he was ready. Faircloth took two or three steps alongside the train which was moving at five to seven miles per hour. Fuller saw Faircloth put his hand on the grabhandle of the car. This is done so that the switchman can support himself while lifting the cutting lever. Faircloth reached between the cars as if to pull the cutting lever. He disappeared between the cars then came "shooting out," landing clear of the train.

Fuller testified that the condition of the track was "very poor on high-low joints." When asked to describe or define a high-low joint, Fuller related the following. A rail is 33½ feet long. At the end of each rail is a joint. The joint consists of a ballast, tieplate, and tie. The tieplate is two pieces of metal with a bolt through them. Under the tieplate is a tie. Under the tie is a ballast. A high-low joint occurs when, after years of wear, the ballast and ground are washed away causing the tie to eat into the ground. This may cause a depression of up to 12 inches. The joint appears to be in good condition, but when heavily loaded cars roll over it they sink into the depression at the high-low joint. This causes the cars to swing violently.

According to Fuller, there were two high-low joints within 12 feet of one another in the area of the accident. Prior to the accident there had been 35 derailments in an unspecified 45-day period.

As Faircloth attempted the three-car kick the cars were swinging violently. The cars were empty. Faircloth was right over a high-low joint as he reached between the cars for the cutting lever. Fuller did not see the high-low joint, but he knew where it was located.

After the accident Fuller inspected the rail cars and found nothing the matter with them. There was nothing improper about the speed of the train or the actions of the crew members. At the time of the accident there were six inches of snow on the ground. No salt or other material had been spread on the snow.

On cross-examination Fuller testified that he had not been subpoenaed to testify but had appeared at Faircloth's request. He traveled from Toledo, Ohio, to appear at trial. He no longer worked for Norfolk because he had been "disqualified."

Faircloth testified that he began working for the railroad in April of 1971. On the date of the accident he was employed as a switchman. He stated that he reported to work at approximately 5 p.m. on the date of the

accident. Fuller told Faircloth that the crew was going to switch a string of cars and that the first movement would be a three car kick. Faircloth was instructed to lift the cutting lever and to hold it in order to make certain it stayed up. He was told there had been trouble in the past with the lever staying up. He testified that the lever was supposed to stay up without being held but that given certain track conditions it must be held to keep it from falling down during a movement.

Fuller asked Faircloth whether he was ready, and Faircloth answered that he was. The train started to move. He had his hand on the grab-iron and was walking alongside the train. He reached in to pull the cutting lever. He was not sure whether he actually got his hand on the lever or not. The cars were coming at him. The only thing he could remember at the time of trial was that he went in between the cars. The next thing he knew he was on his back. There was snow on the ground.

On cross-examination Faircloth testified that there was nothing improper about the speed at which the train was moving, or about what any of his fellow crew members may have done. He knew of nothing improper concerning the rail cars.

The second accident occurred on May 6, 1976, at Norfolk's Homestead yard in Ohio. Faircloth and a member of the crew testified concerning the accident.

Wayne Oestreich testified that on the date in question he was working as a fireman on the crew with Faircloth. Oestreich was sitting in the engine waiting for the crew to come out. He saw Faircloth cross in front of the engine. Faircloth turned around and started walking back towards the engine between the tracks. Faircloth stepped on a piece of broken tie which was partially buried. His leg gave out. Faircloth did not fall to the ground. Faircloth then hobbled back across in front of the engine and went into the yard office.

Oestreich testified that the area in which the accident occurred had previously been the scene of a derailment. The area was undergoing repair and excavation work. The ground was "rough" and there was debris strewn about. There were potholes, gravel and uneven ground. A warning had been posted stating that repair work was being conducted and that the track in the area was closed to traffic.

The condition had existed for "a couple of months." The witness had reported the condition to members of the Safety Committee. To the witness' knowledge the only action that had been taken in response to the complaints was the posting of the warning.

On cross-examination, the witness testified that he could see the piece of broken tie on which Faircloth had stepped. He was 10 or 15 feet away. There was a spotlight shining, so the visibility was good from where he had been sitting. Visibility from the ground would not have been as good because of "shadows."

Faircloth testified that he was walking between the tracks. He made a turn to come back to meet his conductor. The conductor was right behind him before he turned. Faircloth's left leg hit an object causing him to twist his body. He slipped into a hole.

Faircloth and the conductor were each carrying a lighted lantern. He was looking where he was walking, but he could not walk with his head all the way down because he had to watch for trains.

After his foot hit the object he saw that it was a piece of broken tie. It was a foot or a foot and a half long and protruded from the ground between the tracks.

According to Faircloth's testimony the condition of the area where the accident occurred was very uneven. There was debris on the ground including gravel, air hoses, brakeshoes, knuckles, and grain. At the time of the second accident the yard was not really dark but neither was it very well illuminated. He did not see the tie before he stepped on it. There were shadows from engines and box cars which would have prevented him from seeing the tie even if he had looked at it.

Faircloth's initial arguments concern the sufficiency of the evidence. He contends first that the jury verdicts were against the manifest weight of the evidence and secondly that the trial court abused its discretion in not granting his motion for a new trial which alleged that the verdicts were against the manifest weight of the evidence. He argues that the controlling standard was set forth in *Marsh v. Illinois Central R.R. Co.* (5th Cir. 1949), 175 F. 2d 498, 500, wherein the court stated:

"A motion for a new trial is addressed to the trial judge's discretion. He may grant a new trial * * * (and he alone can) because he thinks the verdict is wrong, though supported by some evidence. The exercise of his discretion is not ordinarily reviewable on appeal, though a failure to exercise discretion, or an abuse of it, may be corrected."

Faircloth also relies upon the following statement in *Bazile v. Bisso Marine Co.* (5th Cir. 1979), 606 F. 2d 101, 105:

"As far as the motion for a new trial, the trial judge can grant a new trial if he believes the verdict is contrary to the weight of the evidence. [Citations.] * * * [I]n a motion for a new trial the judge is free to weigh the evidence. As an appellate court, our review of the granting of the motion for a new trial is severely limited—the lower court's action is discretionary and we may interfere only when the court abuses its discretion or fails to exercise it."

Norfolk argues that manifest weight is not the controlling standard but rather that in Illinois a new trial may be granted only where there is a complete absence of probative facts to support the verdicts. *Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104.

Under either standard, our review of the denial of Faircloth's motion for a new trial is, as stated in *Bazile*, "severely limited." Even under the manifest weight standard urged by Faircloth, we do not believe the trial court abused its discretion in denying his motion for a new trial. According, we will not disturb on appeal the trial court's denial of the motion for a new trial or its determination that the jury's verdicts were supported by the evidence.

Concerning the first accident, the witnesses agree that there was nothing improper concerning the speed of the train, actions of the crew members, or condition of the rail cars. Although there was testimony that there were six inches of unsalted snow on the ground, there is nothing in the record to indicate that this condition bore any relationship to the accident.

Fuller testified that there were high-low joints in the track in question, that high-low joints cause the cars to swing violently, and that the cars were at the time of the accident swinging violently. Faircloth did not mention high-low joints or whether the cars were swinging. There was no testimony as to whether the presence of high-low joints or the swinging of the cars related to the accident. Neither witness testified that Faircloth was struck, pulled, pushed or caught by the cars. Further, Fuller's testimony in this regard was somewhat contradictory. He stated that rails are 33½ feet long and that joints occur where the rails meet. His subsequent testimony was that there were two high-low joints within 12 feet of one another in the area in question. He testified that when heavily loaded cars roll over high-low joints a violent swinging action occurs. Here, the rail cars were empty. Additionally, the jury was entitled to consider that Fuller had been disqualified for work by the defendant railroad after 22 years of employment. Faircloth, testifying on his own behalf, was no longer employed by Norfolk.

Concerning the second accident, Oestreich testified that Faircloth stepped on a piece of tie and that Faircloth's leg then gave out. The area was undergoing repair, was the scene of excavation work, and was littered with debris. Faircloth testified to similar facts except that instead of testifying that his leg gave our, Faircloth stated that after his leg hit the tie his body twisted and he slipped into a hole. The evidence was somewhat contradictory. While Oestreich testified that a bulletin had been posted warning of conditions and stating that the track was closed to traffic, Faircloth testified that he could not look toward the ground constantly while he was walking because he had to be alert for the movement of trains. Additionally, Faircloth stated that poor lighting would have kept him from seeing the tie, although he and the conductor he had been walking with each carried a lighted lantern. The jury also heard Oestreich testify that a light was shining on the tie from where he was sitting but that from Faircloth's position the ties was in shadows.

Faircloth also contends that the trial court failed to exercise discretion when ruling on his motion for a new trial. This contention is based on the following statement made by the trial court:

> "I have reached the conclusion that the motion for new trial is hereby denied in that the record itself speaks and the only one that can decide this matter is the Appellate Court."

A similar contention was made in *Asher v. Stromberg* (1966), 78 Ill. App. 2d 267, 223 N.E.2d 300, in which the jury held for the defendant and the trial judge denied the plaintiff's motion for a new trial, remarking "'I have to await the ruling of a higher court.'" (*Asher*, 78 Ill. App. 2d 267, 276, 223 N.E.2d 300, 304.) The appellate court, considering all of the trial court's comments in context, rejected the plaintiff's contention that the trial judge had erroneously concluded that he had no authority or power to weigh the evidence.

Here, the trial court requested and received legal memoranda on the motion from counsel for each party. It heard argument on the issues. The court stated that he had read most of the cases submitted and was "very familiar" with the proposition of law involved. Additionally, the trial court and plaintiff's counsel agreed on the record that the trial court was not refusing to exercise its discretion. This is evidenced by the following colloquy which occurred at the hearing on Faircloth's motion:

> "THE COURT: But the limitation [on the court's discretion in ruling on a motion for a new trial] only is that he cannot abuse his power and discretion.
>
> COUNSEL FOR THE PLAINTIFF: That is the only limitation on the Trial Court.
>
> THE COURT: Yes.
>
> COUNSEL FOR PLAINTIFF: And the Marsh case goes further and says that when the Judge refuses to exercise his discretion it can be remanded to him and he must exercise the discretion.
>
> THE COURT: We don't have that element involved here.
>
> COUNSEL FOR PLAINTIFF: No."

Considering all of his remarks in context, we are not persuaded that the trial judge believed he had no authority to exercise discretion or that he refused to exercise his discretion. Rather, we believe the trial court's comment, when viewed in context, was meant only to indicate that having made its ruling on the motion for a new trial the unsuccessful litigant was left with the option to appeal.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.